(Nos. 64173, 64466 cons.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. JOHN E. GEEVER *et al.*, Appellees.—THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. PETER SOTOS, Appellee.

*Opinion filed March 23, 1988.—Rehearing denied May 31, 1988.*

314

CLARK, J., dissenting.

Neil F. Hartigan, Attorney General, of Springfield (Roma Jones Stewart, Solicitor General, and Mark L. Rotert and David E. Bindi, Assistant Attorneys General, of Chicago, of counsel), for the People.

Jeffrey B. Fawell, of Fawell & Fawell, of Wheaton, for appellees.

Richard M. Daley, State's Attorney, of Chicago

(Thomas V. Gainer, Jr., and Sharon L. Gaull, Assistant State's Attorneys, of counsel), for the People.

Louis B. Garippo, Thomas A. Moore and Susan G. Feibus, of Louis B. Garippo, Ltd., of Chicago, for appellee.

JUSTICE WARD delivered the opinion of the court:

On December 12, 1985, the defendants under docket No. 64173, John and Charlene Geever, were charged in an indictment with, *inter alia*, 12 counts of possession of child pornography in violation of section 11—20.1(a)(2) of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 11—20.1(a)(2)). The defendants moved to dismiss the possession counts contending that section 11—20.1(a)(2) was unconstitutional as violating the first and fourteenth amendments of the Constitution of the United States (U.S. Const., amends. I, XIV), and article I, sections 4 and 6, of the Illinois Constitution of 1970 (Ill. Const. 1970, art. 1, §§4, 6). The circuit court of Du Page County allowed the motion, holding that, under *Stanley v. Georgia* (1969), 394 U.S. 557, 22 L. Ed. 2d 542, 89 S. Ct. 1243, section 11—20.1(a)(2) was unconstitutional as applied to the defendants, on the ground that under the first and fourteenth amendments, the possession of child pornography in their home was permitted. On January 8, 1986, the defendant under docket No. 64466, Peter Sotos, was indicted in three counts for possession of child pornography in his home. Upon his motion to dismiss, the circuit court of Cook County also held section 11—20.1(a)(2) unconstitutional on the same ground. The State, under our Rule 603 (107 Ill. 2d R. 603), directly appealed the dismissals to this court, and we have consolidated the appeals.

The question is whether the State, consistent with the constitutional guarantees of the first and fourteenth amendments (U.S. Const., amends. I, XIV), can proscribe the knowing possession of child pornography in the home.

Section 11—20.1(a)(2) in part provides that the offense of child pornography is committed when a person:

"with the knowledge of the nature or content thereof, reproduces, disseminates, offers to disseminate, exhibits or *possesses* any film, videotape, photograph or other similar visual reproduction of any child whom the person knows or reasonably should know to be under the age of 18 [hereinafter referred to as child or children] engaged in any activity described in subparagraphs (i) through (vii) of paragraph (1) of this subsection [offense of child pornography]." (Emphasis added.) (Ill. Rev. Stat. 1985, ch. 38, par. 11—20.1(a)(2).)

The prohibited portrayals are those where the child is:

"(i) actually or by simulation engaged in any act of sexual intercourse with any person or animal; or

(ii) actually or by simulation engaged in any act of sexual contact involving the sex organs of the child and the mouth, anus, or sex organs of another person or animal; or which involves the mouth, anus or sex organs of the child and the sex organs of another person or animal; or

(iii) actually or by simulation engaged in any act of masturbation; or

(iv) actually or by simulation portrayed as being the object of, or otherwise engaged in, any act of lewd fondling, touching, or caressing involving another person or animal; or

(v) actually or by simulation engaged in any act of excretion or urination within a sexual context; or

(vi) actually or by simulation portrayed or depicted as bound, fettered, or subject to sadistic, masochistic, or sadomasochistic abuse in any sexual context; or

(vii) depicted or portrayed in any pose, posture or setting involving a lewd exhibition of the genitals of the child or other person." Ill. Rev. Stat. 1985, ch. 38, pars. 11—20.1(a)(1)(i) through (a)(1)(vii).

The defendants contend, and the respective circuit courts agreed, that their right to freedom of thought and expression in the privacy of their own home, as recognized in *Stanley v. Georgia* (1969), 394 U.S. 557, 22 L.

Ed. 2d 542, 89 S. Ct. 1243, precludes the State from making criminal the possession of child pornography in the home.

In *Stanley v. Georgia* (1969), 394 U.S. 557, 22 L. Ed. 2d 542, 89 S. Ct. 1243, pursuant to a search warrant, Federal and State agents of Georgia searched the defendant's home for evidence of bookmaking activities; in the process, the agents discovered three reels of film. Viewing the films, the agents determined that they were obscene and arrested the defendant for possession of "obscene matter." The defendant was indicted for " 'knowingly hav[ing] possession of *** obscene matter' in violation of Georgia law." On appeal, the Supreme Court held that the Georgia statute was unconstitutional as violative of the first and fourteenth amendments.

In striking down the statute, the Court observed that in its prior decision in *Roth v. United States* (1957), 354 U.S. 476, 485, 1 L. Ed. 2d 1498, 1507, 77 S. Ct. 1304, 1309, it held that " 'obscenity is not within the area of constitutionally protected speech or press.' " *(Stanley v. Georgia* (1969), 394 U.S. 557, 560, 22 L. Ed. 2d 542, 546, 89 S. Ct. 1243, 1245.) The Court, however, stated that the fact that material is obscene and without protection of the first amendment does not preclude the Court from inquiring into the government's interest in regulating obscenity, as that interest cannot, in every circumstance, be insulated from all constitutional protections. *Stanley v. Georgia* (1969), 394 U.S. 557, 563, 22 L. Ed. 2d 542, 548, 89 S. Ct. 1243, 1246-47.

In examining the constitutional considerations involved in a State statute prohibiting the simple possession of obscene materials in the home, the Court stated:

"It is now well established that the Constitution protects the right to receive information and ideas. 'This freedom [of speech and press] ... necessarily protects the right to receive ....' [Citations.] This right to receive in-

formation and ideas, regardless of their social worth [citation], is fundamental to our free society. Moreover, in the context of this case—a prosecution for mere possession of printed or filmed matter in the privacy of a person's own home—that right takes on an added dimension. For also fundamental is the right to be free, except in very limited circumstances, from unwanted governmental intrusions into one's privacy. ***

*** Whatever may be the justifications for other statutes regulating obscenity, we do not think they reach into the privacy of one's own home. If the First Amendment means anything, it means that a State has no business telling a man, sitting alone in his own house, what books he may read or what films he may watch. Our whole constitutional heritage rebels at the thought of giving government the power to control men's minds." (*Stanley v. Georgia* (1969), 394 U.S. 557, 564-65, 22 L. Ed. 2d 542, 549-50, 89 S. Ct. 1243, 1247-48.)

Recognizing the limitation upon a government's right "to control men's minds," the Court rejected Georgia's contention that it could prohibit the possession of obscenity in the home. Georgia argued that it had the right "to protect the individual's mind from the effects of obscenity." The Court rejected this as "wholly inconsistent with the philosophy of the First Amendment," in that it attempted to control the moral content of a person's thoughts. (*Stanley v. Georgia* (1969), 394 U.S. 557, 565-66, 22 L. Ed. 2d 542, 550, 89 S. Ct. 1243, 1248.) The Court also rejected the claim that such obscene materials "may lead to deviant sexual behavior or crimes of sexual violence." The Court said that not only was there scant empirical data to support that conclusion, but also that if the State's concern rested solely upon the basis that the private consumption of such printed material caused antisocial behavior, the ordinary deterrents of education and criminal punishment were available for violations of the law. 394 U.S. at 566, 22 L. Ed. 2d at 550, 89 S. Ct. at 1249.

Rejecting Georgia's arguments, the Supreme Court held the statute unconstitutional on the ground that "the First and Fourteenth Amendments prohibit making mere private possession of obscene material a crime. \*\*\* [Although] the States retain broad power to regulate obscenity; that power simply does not extend to mere possession by the individual in the privacy of his own home." *Stanley v. Georgia* (1969), 394 U.S. 557, 568, 22 L. Ed. 2d 542, 551, 89 S. Ct. 1243, 1249-50.

Thirteen years later in *New York v. Ferber* (1982), 458 U.S. 747, 73 L. Ed. 2d 1113, 102 S. Ct. 3348, the Supreme Court was presented with the issue of whether the State of New York, consistent with the first amendment, could prohibit the dissemination of material depicting children under the age of 16 engaged in sexual conduct, regardless of whether such depiction was legally obscene.

The defendant in *Ferber*, the proprietor of a bookstore specializing in sexually oriented materials, sold two films to an undercover police officer; the films primarily depicted two young boys masturbating. The defendant was indicted on two counts of promoting an obscene sexual performance and two counts of violating section 263.15 of the New York penal law, which provided:

> "A person is guilty of promoting a sexual performance by a child when, knowing the character and content thereof, he produces, directs or promotes any performance which includes sexual conduct by a child less than sixteen years of age." (N.Y. Penal Law §263.15 (McKinney 1980).)

The defendant was found guilty on the two counts under section 263.15, without proof that the films were obscene. The New York Court of Appeals, however, reversed on the ground that section 263.15 violated the first amendment. Although the court recognized the "State's legitimate interest in protecting the welfare of minors" and noted this "interest may transcend First

Amendment concerns," the court held the New York statute unconstitutional.

The Supreme Court in *Ferber* began its opinion with the observation that "[i]n recent years, the exploitive use of children in the production of pornography has become a serious national problem. \*\*\* '[C]hild pornography and child prostitution have become highly organized, multimillion dollar industries that operate on a nationwide scale.' S. Rep. No. 95–438, p.5 (1977)." (*New York v. Ferber* (1982), 458 U.S. 747, 749 & n.1, 73 L. Ed. 2d 1113, 1117 & n.1, 102 S. Ct. 3348, 3350 & n.1.) The Court then considered whether a State has greater authority "in proscribing works portraying sexual acts or lewd exhibition of genitalia by children" than proscribing obscene materials portraying adult activity.

In addressing this, the Court said that the obscenity standard as set forth in *Miller v. California* (1973), 413 U.S. 15, 37 L. Ed. 2d 419, 93 S. Ct. 2607, would not be applied to the area of child pornography. The standard in *Miller* provided that a " 'state offense must be limited to works, which taken as a whole, appeal to the prurient interest in sex, which portrays sexual conduct in a patently offensive way, and which, taken as a whole, do not have serious literary, artistic, political, or scientific value.' " (*New York v. Ferber* (1982), 458 U.S. 747, 755, 73 L. Ed. 2d 1113, 1121, 102 S. Ct. 3348, 3353.) The *Ferber* Court reasoned:

> "The *Miller* standard, like its predecessors, was an accommodation between the State's interests in protecting the 'sensibilities of unwilling recipients' from exposure to pornographic material and the dangers of censorship inherent in unabashedly content-based laws. Like obscenity statutes, laws directed at the dissemination of child pornography run the risk of suppressing protected expression by allowing the hand of the censor to become unduly heavy. For the following reasons, however, we are persuaded that the States are entitled to *greater leeway in*

*the regulation of pornographic depictions of children.*"
(Emphasis added.) 458 U.S. at 756, 73 L. Ed. 2d at 1122,
102 S. Ct. at 3354.

The Court recognized objectives and justifications of
the State for imposing restraints on the commercial pro-
duction and distribution of child pornography. First, the
Court determined that a State's interest in safeguarding
the physiological and psychological well-being of a minor
is a " 'compelling' " State interest, and that the preven-
tion of the exploitation of children is a governmental ob-
jective of surpassing importance. (*New York v. Ferber*
(1982), 458 U.S. 747, 756-57, 73 L. Ed. 2d 1113, 1122-23,
102 S. Ct. 3348, 3354-55.) The Court said: " 'A demo-
cratic society rests, for its continuance, upon the healthy,
well-rounded growth of young people into full maturity as
citizens.' [Citation.] Accordingly, we have sustained legis-
lation aimed at protecting the physical and emotional
well-being of youth *even when the laws have operated in
the sensitive area of constitutionally protected rights.*"
(Emphasis added.) (458 U.S. at 757, 73 L. Ed. 2d at 1122,
102 S. Ct. at 3354.) The Court further stated that "[t]he
legislative judgment, as well as the judgment found in rel-
evant literature, is that the use of children as subjects of
pornographic materials is harmful to the physiological,
emotional, and mental health of the child." 458 U.S. at
758, 73 L. Ed. 2d at 1123, 102 S. Ct. at 3355.

Second, the Court said that the distribution of photo-
graphs and films depicting children engaged in sexual ac-
tivity is "intrinsically related" to the sexual abuse of chil-
dren in at least two ways. "First, the materials produced
are a permanent record of the children's participation[,]
and the harm to the child is exacerbated by their circula-
tion. Second, the distribution network for child pornogra-
phy must be closed if the production of material which re-
quires the sexual exploitation of children is to be
effectively controlled." (458 U.S. at 759, 73 L. Ed. 2d at

1124, 102 S. Ct. at 3355-56.) The Court noted that the most expeditious and practical method of law enforcement may be to "dry up the market for this material" by imposing severe criminal sanctions upon those persons engaged in selling, advertising or promoting such material. 458 U.S. at 760, 73 L. Ed. 2d at 1124, 102 S. Ct. at 3356.

Recognizing the resulting physical and emotional harm to the child, the Court rejected the defendant's argument that a State would sufficiently protect its interests in the welfare of its children by prohibiting the distribution of materials that are legally obscene under the *Miller* standard. The Court stated:

> "While some States may find that this approach properly accommodates its interests, it does not follow that the First Amendment prohibits a State from going further. The *Miller* standard, like all general definitions of what may be banned as obscene, does not reflect the State's particular and more compelling interest in prosecuting those who promote the sexual exploitation of children. Thus, the question under the *Miller* test of whether a work, taken as a whole, appeals to the prurient interest of the average person bears no connection to the issue of whether a child has been physically or psychologically harmed in the production of the work. Similarly, a sexually explicit depiction need not be 'patently offensive' in order to have required the sexual exploitation of a child for its production. In addition, a work which, taken on the whole, contains serious literary, artistic, political, or scientific value may nevertheless embody the hardest core of child pornography. 'It is irrelevant to the child [who has been abused] whether or not the material...has a literary, artistic, political, or social value.' [Citation.] We therefore cannot conclude that the *Miller* standard is a satisfactory solution to the child pornography problem." *New York v. Ferber* (1982), 458 U.S. 747, 760-61, 73 L. Ed. 2d 1113, 1125, 102 S. Ct. 3348, 3356-57.

Observing that the advertising and selling of child pornography provides the financial incentive to produce

child pornography, the Court stated that " '[i]t rarely has been suggested that the constitutional freedom for speech and press extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute.' " Too, the Court commented that the value of child pornography as an important and necessary part of a literary performance, or scientific or educational work is "exceedingly modest, if not *de minimis.*" (458 U.S. at 761-62, 73 L. Ed. 2d at 1125-26, 102 S. Ct. at 3357.) Thus, the Court concluded, when a definable class of material bears so heavily and pervasively on the welfare of the children involved in its creation and production, the balancing of competing interests is struck and it is recognized that these materials are without protection of the first amendment. 458 U.S. at 764, 73 L. Ed. 2d at 1127, 102 S. Ct. at 3358.

The Court stated that in determining what constitutes child pornography: "A trier of fact need not find that the material appeals to the prurient interest of the average person; it is not required that the sexual conduct portrayed be done so in a patently offensive manner; and the material at issue need not be considered as a whole." (458 U.S. at 764, 73 L. Ed. 2d at 1127, 102 S. Ct. at 3358.) In order, however, to impose criminal sanctions for the distribution of child pornography, the Court said that there must be some element of *scienter* on the part of the defendant. (458 U.S. at 765, 73 L. Ed. 2d at 1127, 102 S. Ct. at 3358.) The State's right, however, to regulate the dissemination of child pornography is not without limitation: "the conduct to be prohibited must be adequately defined by the applicable state law, as written or authoritatively construed," and the category of " 'sexual conduct' proscribed must also be suitably limited and described." (458 U.S. at 764, 73 L. Ed. 2d at 1127, 102 S. Ct. at 3358.) As to other depictions of sexual conduct, not otherwise obscene and not involving live

performances, their production or reproduction, the Court said these materials do have the protection of the first amendment. 458 U.S. at 764-65, 73 L. Ed. 2d at 1127, 102 S. Ct. at 3358.

In construing a statute, a court is to ascertain and give effect to the legislature's intent in its enactment. Considering a statute in its entirety, a court notes the subject it addresses and the legislature's apparent objective. It will be presumed that the legislature acted in light of the provisions of the Constitution and did not propose to act inconsistently with its protections. Accordingly, a court must construe a statute as not offending the Constitution, provided that the construction is a reasonable one. *Gill v. Miller* (1983), 94 Ill. 2d 52, 56.

It is apparent on the face of the statute that the legislature's purposes in enacting section 11—20.1(a)(2) were to effectively prevent and control the sexual abuse and exploitation of children. The legislature intended to prevent not only the production and dissemination of child pornography, but also its possession as well. (Ill. Rev. Stat. 1985, ch. 38, par. 11—20.1(a)(2).) In proscribing the possession of child pornography, the legislature did not make exceptions.

We, as the Supreme Court did in *Ferber*, recognize that the sexual exploitation of children has become a grave national problem and one that has seriously infected our State. Our appellate court has noted:

> "Congressional investigations indicate that Chicago is a major center for producing and disseminating child pornography. However, it is often impossible to determine the source of child pornography. It is quite common for photographs made in the United States to be sent to foreign countries to be reproduced and then returned to this country to give the impression of foreign origin. (Senate Committee On The Judiciary, Protection of Children Against Sexual Exploitment Act of 1977, S. Rep. No.

95—438, 95th Cong., 1st Sess. 5, 6 (1977).)" *People v. Schubert* (1985), 136 Ill. App. 3d 348, 353.

The emphasis in *Stanley* was on the right to freedom of thought and mind in the privacy of one's own home. (*United States v. Thirty-Seven Photographs* (1971), 402 U.S. 363, 376, 28 L. Ed. 2d 822, 834, 91 S. Ct. 1400, 1408.) Although "[t]he Constitution extends special safeguards to the privacy of the home, just as it protects other special privacy rights such as those of marriage, procreation, motherhood, child rearing, and education" (*United States v. Orito* (1973), 413 U.S. 139, 142, 37 L. Ed. 2d 513, 517, 93 S. Ct. 2674, 2677), that protection is not without limitation. (See *Bowers v. Hardwick* (1986), 478 U.S. 186, 92 L. Ed. 2d 140, 106 S. Ct. 2841 (where the Supreme Court held that the due process clause of the fourteenth amendment does not confer a right of privacy to homosexuals to commit sodomy in the privacy of their homes).) This was made clear in *Stanley* by language which clearly limited the Court's holding to the facts of the case:

> "What we have said in no way infringes upon the power of the State or Federal Government to make possession of other items, such as narcotics, firearms, or stolen goods, a crime. Our holding in the present case turns upon the Georgia statute's infringement of fundamental liberties protected by the First and Fourteenth Amendments. No First Amendment rights are involved in most statutes making mere possession criminal.
>
> *Nor do we mean to express any opinion on statutes making criminal possession of other types of printed, filmed, or recorded materials.* \*\*\* In such cases, *compelling reasons may exist for overriding the right of the individual to possess those materials.*" (Emphasis added.) (*Stanley v. Georgia* (1969), 394 U.S. 557, 568 n.11, 22 L. Ed. 2d 542, 551 n.11, 89 S. Ct. 1243, 1249-50 n.11.)

And as the Court recognized in *Ferber*, the States have a "compelling" interest in the protection of the health and

welfare of children, and therefore, are entitled to greater leeway in the regulation of pornographic depictions of children. *New York v. Ferber* (1982), 458 U.S. 747, 756-57, 73 L. Ed. 2d 1113, 1122, 102 S. Ct. 3348, 3354.

The purpose of the statute, unlike that in *Stanley*, is not to limit the individual's freedom of thought and mind in his own home, nor is its purpose to regulate the "moral content" of the depictions described. The purpose of section 11—20.1(a)(2) is to prevent the sexual abuse and exploitation of children by "drying up" the market for child pornography. (See *People v. Spargo* (1982), 103 Ill. App. 3d 280, 285.) The incentive for the production and dissemination of child pornography is the ability to sell or distribute the pornography to the ultimate customer or possessor. In prohibiting without restriction possession of child pornography, the legislature has sought to "dry up" the final and most important link in the chain of distribution of child pornography.

Unlike *Stanley*, where the Court determined there was no empirical data to link the private possession in the home of obscenity with deviate sexual behavior or crimes of sexual violence, the private possession of child pornography further exacerbates the harm and abuse to the child victim.

"The injury suffered by child victims of pornography is akin to that experienced by the victims of sexual abuse and prostitution. Yet, pornography poses an even greater threat to the child victim than does sexual abuse or prostitution. Because the child's actions are reduced to a recording, the pornography may haunt him in future years, long after the original misdeed took place. A child who has posed for a camera must go through life knowing that the recording is circulating within the mass distribution system for child pornography. Therefore, even if the child can overcome the humiliation of the act of posing itself, he must carry with him the distressful feeling that his act has been recorded for all to see." (Shouvlin, *Pre-*

*venting the Sexual Exploitation of Children: A Model Act,* 17 Wake Forest L. Rev. 535, 545 (1981).)

See also *New York v. Ferber* (1982), 458 U.S. 747, 759, 73 L. Ed. 2d 1113, 1124, 102 S. Ct. 3348, 3355-56; *People v. Spargo* (1982), 103 Ill. App. 3d 280, 286; Clinton, *Child Protection Act of 1984—Enforceable Legislation to Prevent Sexual Abuse of Children,* 10 Okla. City U.L. Rev. 121, 146-47 (1985); Donnelly, *Protection of Children from Use in Pornography: Toward Constitutional and Enforceable Legislation,* 12:2 U. Mich. J.L. Ref. 295, 301 (1979).

In our political history and under our law the home has been regarded as a shielded place of privacy. There are circumstances, however, which call for the individual's right to this sanctuary to be balanced against critical interests of society. We consider that under the circumstances here the individual's assurance of full freedom of conduct in the home must yield, consistently with the Supreme Court's holding (*Bowers v. Hardwick* (1986), 478 U.S. 186, 92 L. Ed. 2d 140, 106 S. Ct. 2841), to society's "most compelling" interest to protect its children from the lasting harm of emotional and sexual degradation. The proscribing statute requires knowledge by the possessor as to the content or nature of the depictions, and it specifically describes in subparagraphs (i) through (vii) the depictions and conduct subject to the statute. We hold that the statute is not in violation of the first or fourteenth amendments of the Constitution of the United States or of article I, sections 4 and 6, of the Constitution of Illinois of 1970.

We are not the only court to reach such a conclusion. In *State v. Meadows* (1986), 28 Ohio St. 3d 43, 503 N.E.2d 697, *cert. denied* (1987), 480 U.S. 936, 94 L. Ed. 2d 771, 107 S. Ct. 1581, the defendant was arrested for possession of a picture and various magazines depicting children engaged in sexual activity in violation of an Ohio

statute prohibiting such knowing possession. The materials were found in the defendant's hotel room, where he resided, pursuant to a search warrant. The defendant argued that the statute, to the extent it criminalized the private possession of material involving a minor participating or engaging in sexual activity, was unconstitutional under the first and fourteenth amendments.

The supreme court of Ohio upheld the constitutionality of the statute, determining that the State's interest in protecting children from the exploitation of child pornography was so compelling an interest that it justified intrusion upon the defendant's first amendment right to privacy of thought and mind in his home. The court stated:

> "Unlike the obscene materials considered in *Stanley, Miller*, et al., child pornography involves, by its nature, the physical, mental and sexual abuse, seduction and harmful exploitation of children. The depictions sought to be banned by the state are but memorializations of cruel mistreatment and unlawful conduct. Additionally, such material would continue to exploit and victimize the children shown by haunting them in the future. *** We believe the interests of the state in protecting the privacy, health, emotional welfare and well-rounded growth of its young citizens, together with its undeniable interest of safeguarding the future of society as a whole, comprise exactly the type of 'compelling reasons' justifying a 'very limited' First Amendment intrusion envisioned by the *Stanley* court. At the same time, the cost to the individual possessor's right of free speech, privacy and thought, caused by the state's banning of visual momentos from an episode of sexual abuse of a child, is slight. Moreover, the content value of such material is trifling and alternative means of stimulation exist." (*State v. Meadows* (1986), 28 Ohio St. 3d 43, 50, 503 N.E.2d 697, 703.)

The court of criminal appeals of Alabama, in *Felton v. State* (Ala. Crim. App. Dec. 30, 1986), No. 8, Div. 547, in agreement with the reasoning of *State v. Meadows*, upheld the constitutionality of a statute criminalizing the

possession of child pornography, though such possession may be in the home. The court held that child pornography does not come within the protection of *Stanley*. See also *United States v. Andersson* (7th Cir. 1986), 803 F.2d 902, 907 n.3 (where the court discusses that a State's interest in regulating child pornography "may well extend into the private home").

Also we would observe that several other States have enacted statutes that criminalize the knowing possession of child pornography, with the criminal sanctions ranging from misdemeanor to felony. See, *e.g.*, Ohio Rev. Code Ann. §2907.322(A)(5) (Baldwin 1986); Okla. Stat. Ann., title 21, §1021.2 (1987 Supp.); Nev. Rev. Stat. Ann., §200.730 (1986); S.D. Codified Laws, title 22—22—23.1 (1987 Supp.); Texas Penal Code Ann. §43.26(a)(1) (Vernon 1987 Supp.); Utah Code Ann. §76—5a—3(1)(a) (1987 Supp.); Wash. Rev. Code §9.68A.070(1) (1987 Supp.).

The defendants also argue that they were deprived of their right to due process in that they were not given fair notice under the Illinois statute that the "mere possession" of child pornography in the home was illegal. They contend that in possessing the child pornography they relied upon the decision in *Stanley* that the mere possession of obscene materials in the home could not be proscribed under the first and fourteenth amendments.

It is well settled that the "fair-warning requirement embodied in the Due Process Clause prohibits the States from holding an individual 'criminally responsible for conduct which he could not reasonably understand to be proscribed.'" (*Rose v. Locke* (1975), 423 U.S. 48, 49, 46 L. Ed. 2d 185, 188, 96 S. Ct. 243, 244; *People v. Parkins* (1979), 77 Ill. 2d 253, 256.) As this court has said:

> "'Impossible standards of specificity, however, are not required. [Citations.] *** "Condemned to the use of words, we can never expect mathematical certainty from our language." [Citation.] *** [A] court will assume, ab-

sent contrary legislative intent, that the words of the statute have their ordinary and popularly understood meanings. [Citation.] In addition to the language used, consideration is to be given to the legislative objective and the evil the statute seeks to remedy. [Citation.] [As we said before,] [a] statute enjoys a presumption of constitutionality. [Citation.]' " *People v. Parkins* (1979), 77 Ill. 2d 253, 256-57, quoting *People v. Schwartz* (1976), 64 Ill. 2d 275, 280-82.

We determine here that the statutory language of section 11—20.1(a)(2) provides sufficient notice as to what conduct is proscribed; therefore, the defendants' right to due process has not been violated. Too, the defendants' reliance on their interpretation of *Stanley* as giving them the right to possess child pornography in the home is misplaced.

For the reasons given, the judgments of the circuit courts are reversed and these causes are remanded for proceedings consistent with this opinion.

*Judgments reversed;*
*causes remanded.*

JUSTICE CLARK, dissenting:

This is a difficult case, and it is with great reluctance that I dissent from the well-written majority opinion.

The material which the defendants are charged with possessing is admittedly repugnant. The State's power to ban its commercial production and distribution is clear. (*New York v. Ferber* (1982), 458 U.S. 747, 73 L. Ed. 2d 1113, 102 S. Ct. 3348.) But I cannot agree that the State may peremptorily proscribe part of the contents of a private library, even if the material proscribed is usually unprotected by the first amendment. Where private possession of visual, written, or printed materials is concerned, the State must make a showing that the proscription is necessary to vindicate a compelling inter-

est which cannot be served by some more narrowly tailored means. (See *Stanley v. Georgia* (1969), 394 U.S. 557, 568 n.11, 22 L. Ed. 2d 542, 551 n.11, 89 S. Ct. 1243, 1249 n.11.) Since I see no evidence except the assertion that the State cannot secure its admittedly compelling interests by banning the production and distribution of child pornography, rather than its private possession, I believe that this statute violates the first and fourteenth amendments to the Federal Constitution. Even assuming, however, that the statute does not fall afoul of the Federal Constitution, I am nevertheless convinced that it violates article I, sections 4 and 6, of our State constitution. For these reasons, I respectfully dissent.

I

Analysis of any first amendment question must begin with two inquiries: (1) Is the activity which the State seeks to regulate within the protection granted to "speech" under the first amendment? and, if so: (2) What is the standard of persuasion or proof that the State must meet in order to justify its regulation?

The contours of the "speech" protected by the first amendment are determined by reference to the amendment's basic purposes. Speech is protected against governmental intrusion for reasons which range from the political and societal to the cultural and personal.

Freedom of speech, particularly freedom of political speech, is a necessary precondition for the maintenance of democratic self-government. (T. Emerson, The System of Freedom of Expression 46-48 (1970); A. Meiklejohn, Political Freedom 24-28 (1965).) A representative democracy presupposes the free competition of political ideas in the electoral marketplace. Political minorities must be given the chance to be heard and to persuade. No transient political majority can be granted a monopoly on

free speech. (*Gitlow v. New York* (1925), 268 U.S. 652, 673, 69 L. Ed. 1138, 1149, 45 S. Ct. 625, 632 (Holmes, J., dissenting).) It is this need to maintain the preconditions necessary for political democracy that justifies the judicial abrogation of the will of an elected legislature.

Aside from its political importance, free speech serves several separate, and less obvious, functions. The first amendment protects not only political speech, but also various forms of nonpolitical communication, including nonpolitical art, music, and entertainment. (*Winters v. New York* (1948), 333 U.S. 507, 92 L. Ed. 840, 68 S. Ct. 665.) Communicative expression is protected partially because it is a necessary adjunct to political expression, and partially because the line between political and nonpolitical speech is not easily drawn. (F. Haiman, Speech & Law in a Free Society 171 (1981).) It is also protected for independent reasons: because it plays an essential role in the intellectual and moral development of a free people; because governmental censorship of its production has, historically, undermined the ability of artists to create works of import and value; and because the leisure to exchange and enjoy our creative expressions is one of the goods people seek from life in a civilized society.

Beyond its political or cultural functions, free speech serves a psychological purpose. It grants wide latitude even to the passive consumer of speech. It guarantees to adults the right to form their own personalities and tastes by their own choice of written, printed, or visual matter. (See *Bolger v. Youngs Drug Products Corp.* (1983), 463 U.S. 60, 77 L. Ed. 2d 469, 103 S. Ct. 2875.) It protects in certain instances speech which is inarticulate, incoherent, or crude. (See *Cohen v. California* (1971), 403 U.S. 15, 29 L. Ed. 2d 284, 91 S. Ct. 1780.) As a general rule, it forbids the government from attempting through criminal sanctions to control what peo-

ple privately read, view, or think. This protection is premised upon the notion that privacy of thought (see, e.g., *Wooley v. Maynard* (1977), 430 U.S. 705, 51 L. Ed. 2d 752, 97 S. Ct. 1428) and, even, in certain instances, privacy of behavior, are crucial to the maintenance of political and cultural freedom. As one commentator has put it:

> "The man who is compelled to live every minute of his life among others and whose every need, thought, desire, fancy or gratification is subject to public scrutiny, has been deprived of his individuality and human dignity. Such an individual merges with the mass. His opinions, being public, tend never to be different; his aspirations, being known, tend always to be conventionally accepted ones; his feelings, being openly exhibited, tend to lose their quality of unique personal warmth and to become the feelings of every man. Such a being, although sentient, is fungible; he is not an individual." Bloustein, *Privacy as an Aspect of Human Dignity: An Answer to Dean Prosser*, 39 N.Y.U. L. Rev. 962, 1003 (1964).

The qualities of mind and spirit needed by adult members of a free society will not often be found among people who fear governmental intrusion into their bedrooms and reading rooms.

With these purposes in mind, the United States Supreme Court has delineated categories of spoken, visual, or printed matter which are not "speech" protected by the first amendment because they "are no essential part of any exposition of ideas, and are of such slight social value that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." (*Chaplinsky v. New Hampshire* (1942), 315 U.S. 568, 86 L. Ed. 1031, 62 S. Ct. 766.) At one time these categories included defamation (*Beauharnais v. Illinois* (1952), 343 U.S. 250, 96 L. Ed. 919, 72 S. Ct. 725), commercial speech (*Valentine v. Chrestensen* (1942), 316 U.S. 52, 86 L. Ed. 1262, 62 S. Ct. 920), ob-

scenity (*Roth v. United States* (1957), 354 U.S. 476, 1 L. Ed. 2d 1498, 77 S. Ct. 1304) and fighting words (*Chaplinsky v. New Hampshire* (1942), 315 U.S. 568, 86 L. Ed. 1034, 62 S. Ct. 766). More recently, the Supreme Court has partially dropped defamation (*New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710) and commercial speech (*Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.* (1976), 425 U.S. 748, 48 L. Ed. 2d 346, 96 S. Ct. 1817) from the unprotected zone while including within it child pornography (*New York v. Ferber* (1982), 458 U.S. 747, 73 L. Ed. 2d 1113, 102 S. Ct. 3348).

I therefore freely concede that, in general, child pornography is worthless rubbish not entitled to the protection of the first amendment. However, the majority's heavy reliance upon *Ferber* is misplaced. *Ferber* only addressed the question of whether a State could constitutionally ban the production and distribution of child pornography which did not meet the legal definition of obscenity. *Ferber* neither reached nor purported to reach the question of a ban on private possession. The conclusion reached in *Ferber*—that child pornography enjoyed no more protection than conventional obscenity—in no way affects the validity of *Stanley*. The obscenity at issue in *Stanley* enjoyed no more protection than the material at issue here. The true rationale for *Stanley* turns not on the nature of the material possessed but on the interest of the private possessor.

*Stanley* is based on the first amendment's guarantee of personal autonomy of thought. The material protected bore no direct relation to the political process. It had no cultural value. But the State's attempt to ban its mere private possession necessarily implicated the right of a private individual to determine for himself what he reads, sees, or hears in his own home. Any attempt to

enforce such a law would necessarily infringe upon personal privacy. The very knowledge that police officers might search private libraries for proscribed material might well have an impact upon liberty of thought and belief. It was for this reason that *Stanley* granted to private possession of even unprotected material the highest protection possible under the first amendment: the State was required to provide "compelling reasons" for proscription.

While the majority's analysis purports to apply a compelling-interest test, it is deficient in several respects.

First, to meet a compelling-interest test, the State must usually show not only that its asserted interest is "compelling," but also that its restriction is "narrowly tailored" to serve that interest. (*First National Bank v. Bellotti* (1978), 435 U.S. 765, 786, 55 L. Ed. 2d 707, 724, 98 S. Ct. 1407, 1421.) There can be no question that an interest in preventing child abuse is compelling. (See, *e.g., Globe Newspaper Co. v. Superior Court* (1982), 457 U.S. 596, 73 L. Ed. 2d 248, 102 S. Ct. 2613.) The true question is whether the interest in preventing such abuse can only be served by a ban on private possession.

The majority reasons that such a ban is needed as a necessary adjunct to bans on production and distribution. Supposedly it is not possible to prevent production and distribution without "drying up" the market for child pornography by banning its consumption. If there is any empirical evidence for this proposition, it has escaped me. But more importantly, this is the very argument which was rejected by the Court in *Stanley*. After summarizing the State's assertion that "prohibition of possession of obscene materials is a necessary incident to statutory schemes prohibiting distribution," the Court concluded that the protected interest could not be overridden "by the need to ease the administration of other-

wise valid criminal laws." (*Stanley*, 394 U.S. at 567-68, 22 L. Ed. 2d at 551, 89 S. Ct. at 1249.) Indeed, acceptance of such an argument would render *Stanley* meaningless, because the State could always argue that a ban on private possession of otherwise unprotected speech was a necessary incident to statutes banning its production or distribution.

I suspect that the true reason for the court's decision is simply that the court believes that child pornography is more harmful than obscenity. There indeed may be some justification for treating material which is harmful more harshly than material which is merely worthless. But such a distinction is not supported by citation to any authority, and, if accepted, would limit *Stanley* pretty much to its facts. It could always be argued that banning the private possession of harmful material would prevent the harm that the production or distribution of such material has previously caused.

The only compelling interest which might justify banning private possession of such material would be an interest related to a harm which flows from the possession itself, and not merely from prior production or distribution. I think it is arguable, although the majority does not emphasize this point, that the State has an independent interest in protecting the privacy of abused children by tracking down and destroying materials which record the invasion of that privacy. The State may have an interest in relieving the "distressful feeling that [the abused child's] act has been recorded for all to see." (Shouvlin, *Preventing the Sexual Exploitation of Children: A Model Act*, 17 Wake Forest L. Rev. 535, 545 (1981).) To put it another way, private possession of child pornography might be seen as a continuing invasion of the child's privacy. But there is no indication, either in the record or the briefs, that this statute was designed to serve such an interest, or that this interest could not

be accommodated by more narrowly tailored means. Moreover, since the strength of this interest depends heavily upon the damage done to particular children in particular contexts, a civil suit brought by the child or on the child's behalf would seem to me more narrowly tailored to vindicate the child's interest in regaining peace of mind.

For these reasons, I believe that this statute violates the speech clause of the first amendment to the Federal Constitution, as applied to the States through the due process clause of the fourteenth amendment.

## II

Even were I to assume that this statute could pass muster under the Federal Constitution, I would still believe that it violates article I, sections 4 and 6, of our Illinois Constitution of 1970.

As the majority notes, the parties to this case clearly cited the Illinois Constitution in their briefs. Moreover, their invocation of it was not merely the usual curt appendix to an argument relying principally on the Federal Constitution and Federal precedents (see, *e.g., People v. Davis* (1987), 119 Ill. 2d 61), but a separate argument contained under a separate heading which cited separate authorities. I am therefore particularly disappointed by the majority's failure to separately address it.

Article I, section 6, of our constitution provides that:

> "*The people shall have the right to be secure in their persons, houses, papers and other possessions against unreasonable* searches, seizures, *invasions of privacy* or interceptions of communications by eavesdropping devices or other means. No warrant shall issue without probable cause, supported by affidavit particularly describing the place to be searched and the persons or things to be seized." (Emphasis added.) Ill. Const. 1970, art. I, §6.

The report of the Bill of Rights Committee which accompanied the Committee's draft of section 6 clearly envisioned a broad meaning for the term "invasions of privacy." The Committee stated:

"It is doubtless inevitable that any person who chooses to enjoy the benefits of living in an organized society cannot also claim the privacy he would enjoy if he were to live away from the institutions of government and the multitudes of his fellow men. It is probably also inevitable that infringements on individual privacy will increase as our society becomes more complex, as government institutions are expected to assume larger responsibilities, and as technological developments offer additional or more effective means by which privacy can be invaded. In the face of these conditions the Committee concluded that *it was essential to the dignity and well being of the individual that every person be guaranteed a zone of privacy in which his thoughts and highly personal behavior were not subject to disclosure or review.* The new provision creates a direct right to freedom from such invasions of privacy by government or public officials." (Emphasis added.) 6 Record of Proceedings, Sixth Illinois Constitutional Convention 31-32.

I should think it would be beyond question that a person's choice of reading or viewing matter falls within a "zone of privacy." For reasons I will elaborate below, reading or viewing something within one's own home is a quintessential example of "highly personal behavior." And while invasion into even this type of privacy might be reasonable if justified by a compelling interest, I cannot, for the reasons I advanced above, agree with the majority that the State has demonstrated a compelling interest.

Even were I to agree with the majority on this point, I would still be troubled by the majority's failure to accord our State constitutional protection of privacy a sig-

nificance independent of the right of privacy recognized under the Federal Constitution.

While this court has previously suggested that the search and seizure language of article I, section 6, should be construed in lockstep with Federal interpretation of the fourth amendment (*People v. Tisler* (1984), 103 Ill. 2d 226, 241-42), the same court acknowledged that the revision of article I, section 6, in the Constitution of 1970 contained new provisions dealing with eavesdropping and invasions of privacy. (See *Tisler*, 103 Ill. 2d at 242 ("the intent of the constitutional convention was to extend the protection afforded by the fourth amendment of the Federal Constitution and of our 1870 State Constitution to cover eavesdropping and to protect against invasions of privacy"); *Tisler*, 103 Ill. 2d at 257-58 (Ward, J., concurring) ("the delegates did expand the search-and-seizure provisions in the proposed constitution to include a guarantee of freedom from unreasonable eavesdropping and invasions of privacy").) In other words, our court has implicitly recognized that the citizens of Illinois enjoy greater protection from governmental invasions of privacy under the Illinois Constitution than they enjoy under the Federal Constitution.

In prior opinions I have suggested that we need not march in lockstep with Federal interpretations of Federal constitutional provisions, even when our State constitution is worded similarly. (*People v. Holland* (1987), 121 Ill. 2d 136, 164 (Clark, C.J., specially concurring); *People v. Tisler* (1984), 103 Ill. 2d 226, 258 (Clark, J., specially concurring).) While not wishing to repeat those arguments in detail, I would note that they apply *a fortiorari* to the right of privacy.

Unlike our State constitution, the Federal Constitution does not contain any specific guarantee of privacy. The "right to privacy," nowhere mentioned in the first 10 amendments to the Federal Constitution, has been in-

ferred from the "penumbras" of specific guarantees actually contained in the Bill of Rights, as applied to the States through the due process clause of the fourteenth amendment. (*Griswold v. Connecticut* (1965), 381 U.S. 479, 481-84, 14 L. Ed. 2d 510, 513-15, 85 S. Ct. 1678, 1680-81.) The Court in *Griswold* reasoned that the values inherent in many of the guarantees, particularly those of the first amendment and fourth amendments, bespoke a concern for privacy. The Court also relied on the ninth amendment's reservation of rights to the people.

This approach has been the subject of great criticism and debate. A particular focus of concern has been the extent to which unelected Federal judges may be tempted to use privacy as a tool for the open-ended review of the wisdom or appropriateness of legislation. A related concern has been the perceived absence of any textual or historical support for a constitutional right of privacy. (See, *e.g.*, Ely, *The Wages of Crying Wolf: A Comment on Roe v. Wade*, 82 Yale L.J. 920 (1973).) It has been felt that the absence of such support allows judges, under the guise of interpreting a right of privacy, to write their personal predilections into law.

Perhaps in response to this criticism, the United States Supreme Court has limited the right of privacy in two distinct, although interrelated, ways. First, it has tended to recognize as protected by the right of privacy choices and activities which are related to the family, among them: contraception (*Griswold v. Connecticut* (1965), 381 U.S. 479, 14 L. Ed. 2d 510, 85 S. Ct. 1678), abortion (*Roe v. Wade* (1973), 410 U.S. 113, 35 L. Ed. 2d 147, 93 S. Ct. 705), and familial living arrangements (*Moore v. City of East Cleveland, Ohio* (1977), 431 U.S. 494, 52 L. Ed. 2d 531, 97 S. Ct. 1932). The justification for this focus upon the family has been the perception that the family preceded the establishment of civil soci-

ety and that its preservation must therefore be among the "rights reserved to the people." (*Griswold*, 381 U.S. at 495-96, 14 L. Ed. 2d at 522, 85 S. Ct. at 1688 (plurality opinion).) Second, the Court has sought to find, wherever possible, historical bases for recognized rights of privacy. The Court has derived rights of privacy by scrutinizing the laws and mores prevalent in the late eighteenth and early nineteenth centuries, with an eye towards whether a particular practice was commonly accepted or, instead, routinely proscribed. Thus the Court has derived rights to contraception and abortion from the early lack of legislation against these practices. (See *Roe*, 410 U.S. at 129-40, 35 L. Ed. 2d at 164-70, 93 S. Ct. at 715-20.) Similarly, it derived a right to live in nonconventional living arrangements from the historical prevalence of extended families. (See *Moore*, 431 U.S. at 507-10, 52 L. Ed. 2d at 542-44, 97 S. Ct. at 1939-41 (Brennan, J., concurring, joined by Marshall, J.).) On the other hand, the universal criminalization of nonconventional sexual practices in colonial and nineteenth-century America has been cited to support the proposition that there is no constitutional right to engage in sodomy. *Bowers v. Hardwick* (1986), 478 U.S. 186, 192-94, 92 L. Ed. 2d 140, 146-48, 106 S. Ct. 2841, 2844-46.

I express no opinion about the merits of any of the issues described above, and I would not hesitate to use parts of the Supreme Court's approach in the interpretation of our own guarantee against invasions of privacy. But I am concerned with the absolute subservience to Federal precedent which the majority's uncritical citation of *Hardwick* seems to reflect. The Supreme Court's approach is a guide. It is persuasive. But it is not gospel. I see no reason to limit the "privacy" protected against invasion exclusively to matters relating to the family, although the preservation of family life is obviously of supreme importance. And I do not believe that we are

bound by the norms and mores of our ancestors, instructive as these may be. We, unlike the United States Supreme Court, are dealing with an explicit, rather than an implicit, provision. We are not constrained by the folkways of 1770 or 1870 in the interpretation of a constitution which was adopted in 1970. Nor must our interpretation of privacy proceed in a void. The committee reports, the debates of the convention, and the explanation given to the adopting electorate all are sources for determining its meaning under our State constitution.

As I have stated above, I think the key to the interpretation of our guarantee against unreasonable invasions of privacy is the reference to "highly personal behavior" in the committee report. Behavior can be "highly personal" in one of two senses: it can be "personal" because it reflects individualized drives, peculiarities, or tastes, or because it does not normally affect or harm other individuals. In general, private reading, viewing, and thinking are just such activities. They are highly personal in the sense that they play an important role in forming the human personality, and highly personal in the sense that they will rarely impinge on the legitimate interests of persons other than the person who does the reading, viewing, or thinking. The interest in free access to such activities is fundamental, standing at the confluence of privacy and speech. Since I believe that the majority's opinion fails to give it the proper weight, I dissent.