# Illinois Official Reports

## Appellate Court

*People v. McKown*, 2021 IL App (4th) 190660

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff- Appellee, v. JOHN T. McKOWN, Defendant-Appellant. |
| District & No. | Fourth District<br>No. 4-19-0660 |
| Filed | August 23, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Macon County, No. 18-CF-136; the Hon. Thomas E. Griffith, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part. |
| Counsel on Appeal | James E. Chadd, Catherine K. Hart, and Bryan JW McIntyre, of State Appellate Defender's Office, of Springfield, for appellant.<br><br>Scott Rueter, State's Attorney, of Decatur (Patrick Delfino, David J. Robinson, and Timothy J. Londrigan, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE HARRIS delivered the judgment of the court, with opinion.<br>Justices Turner and Cavanagh concurred in the judgment and opinion. |

**OPINION**

¶ 1        Following a bench trial, defendant, John T. McKown, was found guilty of one count of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2016)), two counts of aggravated criminal sexual abuse (*id.* § 11-1.60(c)(1)(i)), and one count of possessing child pornography (*id.* § 11-20.1(a)(6)). The trial court sentenced him to a total of 20 years in prison. Defendant appeals, arguing his convictions for the contact sex offenses were obtained in violation of the *corpus delicti* rule and the State's evidence was insufficient to establish his guilt beyond a reasonable doubt of those offenses. Defendant also argues his child pornography conviction must be reversed because it was based on his possession of material that cannot constitutionally be deemed child pornography. We affirm in part and reverse in part.

¶ 2                                    I. BACKGROUND

¶ 3        In January 2018, the State charged defendant with three counts of predatory criminal sexual assault of a child (*id.* § 11-1.40(a)(1)) and two counts of aggravated criminal sexual abuse (*id.* § 11-1.60(c)(1)(i)). It later added a third count of aggravated criminal sexual abuse (*id.*) and one count of child pornography (*id.* § 11-20.1(a)(1)(ii)). The charges were based on allegations that between May 2012 and July 2017, defendant sexually abused J.M., his grandson. Specifically, the State alleged defendant placed his penis and "an object" in J.M.'s anus (counts I and III), defendant placed his penis in J.M.'s mouth (count II), J.M.'s hand touched defendant's penis (count IV), defendant transferred his semen onto J.M.'s buttocks (count V), and defendant placed his hand on J.M.'s penis (count VI). In connection with the child pornography count (count VII), the State alleged defendant "knowingly depicted or portrayed by *** visual medium or reproduction a child *** under the age of 13 where such child was actually or by simulation portrayed or depicted and which involved the mouth of the child and the sex organ of another person."

¶ 4        In April and May 2019, the trial court conducted defendant's bench trial. The State's evidence showed J.M. was born on May 5, 2006. His parents, Jacqueline and Brian M., were divorced. After their separation in 2009, Brian began living with his mother, Cheryl, and his father, defendant, in Decatur, Illinois. J.M. and his older sibling, K.M., primarily resided with Jacqueline but would visit and stay with Brian at his parents' home. K.M. did not visit as often as J.M. because she had autism and Brian and his parents "couldn't handle her conditions." From May to July 2017, J.M. stayed with Brian at defendant and Cheryl's residence. In October 2017, J.M. disclosed that defendant sexually abused him. His disclosure occurred shortly after K.M. disclosed that she was abused by Jacqueline's ex-boyfriend.

¶ 5        At the time he testified at trial, J.M. was 12 years old. He recalled visiting Brian at his grandparent's house and stated defendant began sexually abusing him when he was about six years old. The abuse included defendant "put[ting] his penis in [J.M.'s] butt" while they were in the bathroom of defendant's house. J.M. recalled feeling a "sticky" substance on his butt that came from defendant and stated he would clean it off with toilet paper. He denied knowing what the substance was. J.M. testified defendant anally penetrated him "[a] lot," *i.e.*, every time he was at defendant's house. Sometimes, defendant would hit him if he did not do what defendant wanted. The last time that activity occurred was during the summer of 2017, which was also the last time J.M. was at defendant's house.

¶ 6    J.M. also testified that about 10 times, defendant "forced" his penis inside J.M.'s mouth. That activity also occurred in the bathroom of defendant's house. J.M. denied that defendant ever asked J.M. to touch defendant's penis with anything besides J.M.'s mouth. However, he stated defendant did reach around J.M. and touch J.M.'s penis with his hand while defendant's penis was "in [J.M.'s] butt."

¶ 7    J.M. further recalled that, sometimes, defendant put something that "looked like a little balloon" over his penis. Defendant also used "an extender" on his penis, which he placed "in [J.M.'s] butt hole." J.M. stated the "extender" was "a little tube type thing" that defendant put on his penis to make it longer. According to J.M. it "felt like petroleum jelly *** but really, really hard." He stated he learned the word "extender" from his mother, who "researched it" after he explained to her what had happened with defendant.

¶ 8    J.M. also testified that he sometimes went to the basement of defendant's house because some of his toys were kept there. On one occasion when defendant was gone, J.M. went to an area of the basement where defendant had a desk and saw cut-out pictures of little girls with "cut[-]out penises in their mouths."

¶ 9    J.M. testified defendant told him not to tell anyone about the abuse or he would "beat [J.M.] up" or "hurt" J.M.'s family. Defendant also promised to take J.M. to Disneyland. J.M. testified he first reported the abuse to his uncle, who then told J.M.'s mother. He finally reported what was happening because he was "tired of it," and he did not tell earlier because he did not want "to get [his] family hurt." According to J.M., all of the activities he described happened in one house, which was the same house defendant was living in during the summer of 2017. J.M. did not recall how many times something happened, he only knew it "happened a lot." He testified he was 11 years old "when it stopped."

¶ 10    On cross-examination, J.M. recalled being interviewed twice by "a lady" at the Child Advocacy Center (CAC), once in December 2017, and once in October 2018. He agreed that during those interviews he reported that, before the first incident of abuse, defendant told him "not to tell anyone." J.M. also reported that defendant stated, "stay still mother effer." J.M. testified those reports were accurate and defendant made both statements. J.M. also acknowledged that he previously reported that he bit defendant's penis when defendant put it inside his mouth and, thereafter, defendant "never did it again." However, he denied telling the interviewer that such activity only occurred once.

¶ 11    Further, J.M. either denied or stated he did not remember previously reporting that (1) the "sticky" substance he noticed on his buttocks was called "semen"; (2) the abuse occurred in three different houses where defendant lived—a blue house, a white house, and an alabaster house; (3) the abuse started in the blue house; (4) that others, including his father, grandmother, and cousin, were usually home when defendant abused him; and (5) his grandmother "butt f*** [him] with a dildo while [defendant] held [him] down." Instead, J.M. maintained that the abuse occurred only in the bathroom of the house where defendant was living in 2017. He asserted "nobody was really home" when the abuse occurred and testified that it was not true that his grandmother abused him with defendant.

¶ 12    Finally, J.M. asserted he told the CAC interviewer about the "balloon thing" he saw defendant use and that defendant had threatened to kill his family. He also reiterated that he first heard the word "extender" from his mother and testified defendant first mentioned taking him to "Disney" when J.M. stated he was going to tell his dad about what was going on. J.M. denied that he "ever heard anyone else in [his] family mention going to Disney." He testified

that the last time the abuse occurred was during the summer of 2017 but denied that defendant engaged in sexual activity with him on July 4, 2017.

¶ 13 As part of its case, the State introduced and published to the trial court a recording of J.M.'s December 2017 CAC interview. In presenting his defense, defendant introduced and published a recording of J.M.'s second CAC interview, which occurred in October 2018. The record shows that during his initial interview in December 2017, J.M. reported that defendant "molested" him by making J.M. bend over and placing his penis in J.M.'s "butt." J.M. also asserted defendant penetrated him while using an "extender" on his penis and stated he had to wipe "oozy stuff," or "semen," that came from defendant off of his butt with toilet paper. According to J.M., defendant anally penetrated him too many times to count. Defendant also "tried to put [his penis] in [J.M.'s] mouth but [J.M.] bit it and [defendant] never really did it again." J.M. denied that there was any other form of sexual contact between defendant and himself.

¶ 14 J.M. maintained the abuse only occurred in the bathroom of defendant's home. He stated defendant had lived in three different houses—a blue house, a white house, and an alabaster house—and that the abuse started in the blue house when he was about six years old. According to J.M., defendant promised to take him to Disneyland and told him not to tell anyone about what defendant was doing. When the abuse occurred, others were typically home, including J.M.'s father, grandmother, and cousin. J.M. reported that defendant last abused him on July 4, 2017, when J.M. went to take a shower after watching fireworks. Additionally, he reported that he observed defendant watching "kiddie porn" and saw "pictures" defendant had of children that were cut out from magazines with pictures of penises placed into slits in their mouths.

¶ 15 During his October 2018, CAC interview, J.M. reported that he had been having "flashbacks" and dreams that caused him to remember more about the sexual abuse he suffered. Specifically, he had a flashback that his grandmother, Cheryl, "butt f*** [him] with a [red] dildo." Following a dream, he remembered that Cheryl used the "dildo" to penetrate his anus while he was in the bathtub and that defendant was holding him down. J.M. maintained he was abused by Cheryl "a lot." He also reported that when he was abused at his grandparents' home, his dad and cousin were usually gone. Additionally, J.M. stated he recalled defendant telling him to "stay still mother effer."

¶ 16 Jacqueline testified for the State that she filed for divorce from Brian in 2010 and that their divorce was not finalized until 2018. She described the parties' divorce as amicable and testified it took so long to finalize because of money and the parties' residing in different locations. She testified she resided in Kentucky and Brian lived in Illinois and "[i]t was just [a] situation [where] he couldn't get to Kentucky" and she "couldn't get to Illinois at the time." According to Jacqueline, J.M. said the word "extender" to her when he disclosed the abuse. She then "looked it up" because she did not know what an "extender" was.

¶ 17 Eric Matthews testified for the State that he was a detective for the Decatur Police Department and investigated J.M.'s allegations against defendant. On January 15, 2018, he went to defendant's home to speak with him. During his visit, he learned defendant was born on March 30, 1949. Defendant denied the allegations against him and gave Matthews consent to search his residence. Matthews asked defendant where in his residence he watched pornography, and defendant directed him to an area of his basement that defendant called his "man cave." The area was "cordoned off by bed sheets that were hung from the ceiling" and

contained a makeshift desk, a television, a DVD player, a chair, and stacks of DVDs and magazines. Under a board in defendant's "man cave," Mathews observed "multiple cutout pictures of young female children's faces that had slits cut into the mouths and cutout images of male penises inserted into those slits." The room also contained a portable heater with "several masturbatory aids on [the] heater."

¶ 18 Matthews testified that when questioned about the "cutouts," defendant stated "he had been cutting out images of young girls' faces and inserting penises into their mouths for years and that it was a fantasy of his." Defendant acknowledged fantasizing about young girls since he was a teenager, stating he was drawn to their "youthfulness and innocence." He reported that he had "been trying to stop his fantasies for his whole life and ha[d]n't been able to." Defendant believed he needed counseling, stating he was sexually abused as a child by his uncle. He denied being gay and asserted that "homosexual pornography" found in his "man cave" belonged to his son. When questioned further about J.M.'s allegations, defendant stated J.M. had walked in on him two or three times while he was watching pornography and masturbating.

¶ 19 The same day, Matthews interviewed defendant at the police station. The interview was recorded, and the recording was admitted into evidence and published at defendant's bench trial. During the interview, defendant initially denied any physical contact of a sexual nature with J.M. However, shortly following that denial, he stated J.M. had walked in on him while he was masturbating in the basement and "grabbed" his penis. Defendant asserted he told J.M. to get away and J.M. may have got defendant's semen on his hand. He also reported that on a second occasion, J.M. came to the basement and defendant did not stop J.M. from watching him masturbate. On a third occasion, defendant showed J.M. how to masturbate while they watched adult pornography. Defendant stated that while he was masturbating, J.M. pulled his own pants down and began touching himself.

¶ 20 Defendant denied that he engaged in anal sex with J.M., that he touched J.M.'s penis, or that he ejaculated on J.M.'s butt. However, he stated that during a fourth incident in the basement, J.M. had been curious and asked him about the "white stuff." On that occasion, J.M. watched defendant ejaculate. Finally, although defendant stated he knew what an "extender" was and described what one looked like, he had never owned or used one.

¶ 21 Matthews testified defendant was not arrested until January 24, 2018. Following that arrest, Matthews interviewed him a second time. A recording of the second interview was also admitted into evidence and published at trial. During the second interview, Matthews told defendant it was his opportunity to "be truthful" and "get everything on the table" before his case went before a judge or jury. In response, defendant stated that he showed J.M. how to masturbate and in doing so, put his hand on J.M.'s penis. He stated J.M. also put his hand on defendant's penis. Defendant further reported that J.M. made inquiries about anal sex that resulted in J.M. pulling his own pants down, bending over, and defendant rubbing his penis on the "crack" of J.M.'s buttocks. Defendant stated his penis "probably" did touch and go in J.M.'s anus.

¶ 22 Defendant told Matthews that J.M. frequently walked in on him in the basement. He denied that anything ever occurred in the bathroom of his residence and maintained his penis only touched J.M.'s buttocks on one occasion. He also denied promising to take J.M. to Disneyland. When asked to explain why J.M. would report that he had to wipe defendant's semen off his buttocks, defendant theorized that it could have been Vaseline because "each time" J.M. walked in on him in the basement, he just got through watching pornography and masturbating.

¶ 23 On cross-examination, Matthews testified that during his search of defendant's home, he did not find what J.M. had described as an "extender." Further, he agreed that defendant's statements regarding the alleged abuse changed substantially over time. On redirect examination, Matthews agreed that there were times during his January 15, 2018, interview with defendant that he tried to take a break but he "kept getting called back in [the interview room] by [defendant] to continue the conversation."

¶ 24 Aside from the recording of J.M.'s second CAC interview in October 2018, defendant also presented testimony from Cheryl and Brian. Both denied ever seeing defendant and J.M. in the bathroom at the same time and testified such an occurrence would have been unusual. Cheryl also denied telling Matthews that she knew about defendant's "cutout pictures of young girls with penises inserted into their mouths" or that he had sexual fantasies about young girls. Brian denied ever hearing J.M. talk about going to Disneyland or Walt Disney World but stated that J.M. had probably heard him talk about such places. Brian testified he was kidnapped in 1996 when he was 15 years old by a man who took him to Walt Disney World and sexually abused him. Brian stated he began talking to J.M. about his kidnapping when J.M. was six or seven years old and spoke to him about it every day to make J.M. "aware of the dangers that were out there in the world."

¶ 25 Finally, the State called Matthews in rebuttal. Matthews testified when he visited defendant's residence in January 2018, Cheryl reported to him that she was aware of defendant's fantasies about young girls and stated that "he would never act on it." She also reported that she was aware of defendant's cutouts of young girls' faces with penises inserted into their mouths.

¶ 26 Ultimately, the trial court found defendant guilty of one count of predatory criminal sexual assault of a child based on defendant placing his penis in J.M.'s anus (count I) and two counts of aggravated criminal sexual abuse based on J.M. touching defendant's penis with his hand (count IV) and defendant's semen being on J.M.'s buttocks (count V). The trial court also found defendant guilty of possessing child pornography (count VII). In reaching its decision, the court stated as follows:

"There is no doubt in my mind that something bad happened to [J.M.] There was a lot of inconsistencies in [J.M.'s] testimony. [Defense counsel] did a good job of laundry listing it today in terms of where [the abuse] occurred, the number of times it occurred, the people who were present when it occurred, what occurred, whether grandma was involved in the process, whether threats were made, and so on and so forth. And if the State's case was solely based on [J.M.'s] testimony, I think we would be in a much different position today than where [defendant] finds himself."

¶ 27 The trial court stated the inconsistencies in J.M.'s statements accounted for its findings that defendant was not guilty of predatory criminal sexual assault of a child as alleged in counts II and III, based on defendant placing his penis in J.M.'s mouth and an object in J.M.'s anus. Regarding count VI, charging defendant with aggravated criminal sexual abuse based upon defendant placing his hand on J.M.'s penis, the court stated as follows: "As to Count VI, essentially, [J.M.] said it never happened. The defendant said it did happen. That is all the testimony. I can't make a finding of beyond a reasonable doubt based on those two statements."

¶ 28 The trial court found defendant's admissions were "very important, if not critical" to the charges of which it found defendant guilty. It determined his statements were reliable and not coerced. The court noted that although Matthews was "very persistent, *** it was the defendant

who wanted to talk" and who "wanted to make statements even after *** Matthews attempted to leave the room on a number of different occasions." Additionally, the court determined "the physical evidence that was found in" defendant's basement corroborated his statements that he "violated" J.M.

¶ 29 Finally, as to child pornography, the trial court "*sua sponte*" found defendant guilty of "unlawful possession of child pornography, a Class 3 felony." It stated the cutouts in question constituted child pornography, describing them as "sick" and "perverse" and noting they depicted "a penis sticking out of a little girl's mouth that was specifically taped to her mouth by the defendant and they [involved] actual children apparently cut out of parenting magazines."

¶ 30 In June 2019, defendant filed a "motion to reconsider verdict or for new trial." He argued the State's evidence was insufficient to prove his guilt beyond a reasonable doubt. Defendant asked the court to reconsider its findings of guilt and enter judgments of not guilty or grant him a new trial. The State filed a response, asserting defendant's allegation that the evidence was insufficient was "not specific." It "object[ed]" to defendant's request for relief and stated it was "rely[ing] on [its] previous arguments."

¶ 31 In July 2019, the trial court conducted defendant's sentencing hearing. It initially considered defendant's motion to reconsider. In addressing that motion, the parties elected to rely on their previous filings. The court denied the motion, stating as follows:

"I did take some time and carefully review the evidence. I'm sure the two of you picked up on this, but the counts to which [defendant] was found guilty were all counts where the victim indicated something had occurred, and then by the defendant's own statement he confessed or corroborated the same behavior. And as to the other counts, there was just a lot of discrepancy regarding the testimony, and, obviously, that was the basis for my ruling."

The court then sentenced defendant to a total of 20 years in prison. Specifically, it sentenced him to 15 years in prison for predatory criminal sexual assault of a child (count I), 5 years in prison for each aggravated criminal sexual abuse conviction (counts IV and V), and 3 years in prison for possessing child pornography (count VII). The court ordered defendant's sentences for counts IV, V, and VII to be served concurrently with one another but consecutive to defendant's sentence for count I.

¶ 32 The same month, defendant filed a motion to reconsider his sentence. In September 2019, the trial court denied defendant's motion.

¶ 33 This appeal followed.

¶ 34 II. ANALYSIS

¶ 35 On appeal, defendant seeks the reversal of each of his convictions, arguing the evidence presented was insufficient to establish his guilt. He argues that his convictions for each of the contact sex offenses violated the *corpus delicti* rule. Defendant also contends that to the extent his convictions for counts I and V were not barred by that rule, the evidence was otherwise insufficient to establish his guilt of those offenses. Additionally, he maintains his child pornography conviction must be reversed because it was based on his possession of material that cannot constitutionally be deemed child pornography.

¶ 37    In count IV, the State charged defendant with aggravated criminal sexual abuse based upon contact between J.M.'s hand and defendant's penis. On appeal, defendant argues the *corpus delicti* rule bars his conviction for that offense because the only evidence of the sexual conduct alleged was his own uncorroborated statement to the police. We agree.

¶ 38    "The *corpus delicti* of an offense is simply the commission of a crime" and "[a]long with the identity of the person who committed the offense, it is one of two propositions the State must prove beyond a reasonable doubt to obtain a valid conviction." *People v. Lara*, 2012 IL 112370, ¶ 17, 983 N.E.2d 959. "In general, the *corpus delicti* cannot be proven by a defendant's admission, confession, or out-of-court statement alone." *Id.* "When a defendant's confession is part of the *corpus delicti* proof, the State must also provide independent corroborating evidence." *Id.*

> "[T]he *corpus delicti* rule requires only that the corroborating evidence correspond with the circumstances recited in the confession and tend to connect the defendant with the crime. The independent evidence need not precisely align with the details of the confession on each element of the charged offense, or indeed to any particular element of the charged offense." *Id.* ¶ 51.

"If a confession is not corroborated [by independent evidence], a conviction based on the confession cannot be sustained." *People v. Sargent*, 239 Ill. 2d 166, 183, 940 N.E.2d 1045, 1055 (2010).

¶ 39    Here, we find the supreme court's decision in *Sargent*, cited by both parties, is factually similar to the present case and dispositive. In that case, the defendant was convicted of multiple counts of predatory criminal sexual assault and aggravated criminal sexual abuse for engaging in various sexual acts with his minor stepsons, J.W. and M.G. *Id.* at 169. The charges against him were based on allegations that he placed a part of his body in J.W.'s anus (supporting one count of predatory criminal sexual assault), placed a finger in M.G.'s anus (supporting three counts of predatory criminal sexual assault), and fondled M.G.'s penis (supporting two counts of aggravated criminal sexual abuse). *Id.* at 169-70. On appeal, the defendant challenged several of his convictions as they related to M.G. on the basis "that the only evidence adduced by the State on [the challenged] counts consisted of his own, uncorroborated confession." *Id.* at 182.

¶ 40    The supreme court agreed, finding defendant was properly convicted of predatory criminal sexual assault of J.W. and one count of predatory criminal sexual assault of M.G., but his remaining convictions could not "be sustained under the corroboration rule," *i.e.*, the *corpus delicti* rule. *Id.* at 194. Regarding the defendant's convictions for aggravated criminal sexual abuse of M.G., the court noted that "[a]side from [the] defendant's confession, *** there was no evidence of any kind to corroborate that [the] defendant had, in fact, ever touched M.G.'s penis for any purpose." *Id.* at 184. Further, it rejected the State's argument that evidence of the defendant engaging in other charged sexual activity with the minors provided "sufficient corroboration that [the] defendant also fondled M.G.'s penis." *Id.* The court stated as follows:

> "The State contends that evidence of [the] defendant's penetration of M.G.'s anus with his finger and of J.W.'s anus with his penis provides sufficient corroboration that [the] defendant also fondled M.G.'s penis. We note, however, that these were separate acts which gave rise to separate charges. Our precedent demonstrates that under the corroboration rule, the independent corroborating evidence must relate to the specific

events on which the prosecution is predicated. Correspondingly, where a defendant confesses to multiple offenses, the corroboration rule requires that there be independent evidence tending to show that defendant committed each of the offenses for which he was convicted. [Citation.]

　　Such proof is lacking here. *** [A]side from [the] defendant's confession, no evidence was adduced which tended to support the charges that [the] defendant fondled M.G.'s penis for purposes of his own sexual gratification. There may be circumstances where criminal activity of one type is so closely related to criminal activity of another type that corroboration of one may suffice to corroborate the other, but such circumstances are not present here. [Citation.] [The] [d]efendant's convictions and sentences on the two counts of aggravated criminal sexual abuse of M.G. must therefore be reversed." *Id.* at 184-85.

¶ 41　　As indicated, the supreme court also found only one of the defendant's three convictions for predatory criminal sexual assault of M.G., each based on the defendant's penetration of M.G.'s anus with his finger, was sufficiently supported under the corroboration, or *corpus delicti*, rule. *Id.* at 185. It noted that although the defendant confessed to penetrating M.G.'s anus with his finger 50 to 70 times, the nonconfession evidence only clearly corroborated one act of penetration. *Id.* at 185-87.

¶ 42　　Here, like in *Sargent*, defendant was charged with multiple sex offenses based upon separate and distinct sexual acts. In count IV, the State specifically charged defendant with aggravated criminal sexual abuse of J.M., asserting that defendant "had J.M. place his hand on the defendant's penis for the purpose of sexual gratification." See 720 ILCS 5/11-1.60(c)(1)(i) (West 2016) (providing that "[a] person commits aggravated criminal sexual abuse if *** that person is 17 years of age or over and *** commits an act of sexual conduct with a victim who is under 13 years of age"). However, the only evidence that J.M. ever touched defendant's penis came from defendant's own recorded statements to the police. At trial, J.M. described sexual acts involving anal and oral penetration of J.M. by defendant, as well as defendant touching J.M.'s penis. However, J.M. never described using his hand to touch defendant's penis and expressly denied that he was ever asked to touch defendant's penis with anything other than his mouth. Similarly, J.M.'s recorded statements fail to contain any description of the specific sexual conduct alleged in count IV.

¶ 43　　In responding to defendant's argument regarding count IV, the State cites *Sargent* for the proposition that some criminal activity may be "so closely related" to another type of criminal activity that "corroboration of one may suffice to corroborate the other." *Sargent*, 239 Ill. 2d at 185. It also argues that corroboration is not compulsory for each element of a charged offense and suggests J.M.'s statements regarding the other charged sexual acts—including anal and oral penetration and defendant's hand on J.M.'s penis—are sufficient corroboration of defendant's confession for the act alleged in count IV—J.M.'s hand on defendant's penis. However, as set forth above, this is precisely the argument rejected by the supreme court in *Sargent* under very similar factual circumstances. Thus, although the State correctly recites the applicable law under the *corpus delicti* rule, it neglects to consider the manner in which *Sargent* actually applied that law. Like in *Sargent*, there was simply no independent evidence corroborating defendant's confession that related to the specific event upon which count IV was predicated. Accordingly, defendant's conviction for that offense runs afoul of the *corpus delicti* rule.

¶ 44 In so holding, we note that, as defendant argues, the record suggests some confusion by the trial court regarding count IV, of which it found defendant guilty, and count VI, of which it found defendant not guilty. Again, in count IV, the State charged defendant with aggravated criminal sexual abuse of J.M. based on J.M.'s hand touching defendant's penis. In count VI, it charged him with the same offense but based on *defendant's* hand touching *J.M.'s* penis. As discussed above, the act alleged in count IV was only supported by defendant's own statements. J.M. never testified or provided a statement indicating he touched defendant's penis with his hand. The act alleged in count VI, defendant's hand on J.M.'s penis, was supported by not only defendant's statements to the police, but also J.M.'s trial testimony.

¶ 45 However, following defendant's bench trial, the trial court made the following comments regarding count VI when setting forth the basis of its not guilty findings: "As to Count VI, essentially, [J.M.] said it never happened. The defendant said it did happen. That is all the testimony. I can't make a finding of beyond a reasonable doubt based on those two statements." The court's comments clearly conflict with the evidence presented at defendant's trial because J.M. did, in fact, testify that defendant touched his (J.M.'s) penis. It appears that what the court was actually describing was the state of the evidence as it related to count IV, which described a similar act, *i.e.*, hand-to-penis contact.

¶ 46 The trial court's apparent confusion notwithstanding, the record ultimately reflects the court found defendant guilty of count IV, which was only supported by defendant's uncorroborated statements to the police. Thus, under the *corpus delicti* rule, his conviction and sentence for that offense may not stand and must be reversed.

¶ 47 B. Counts I and V—Predatory Criminal Sexual Assault of a Child
and Aggravated Criminal Sexual Abuse

¶ 48 On appeal, defendant next argues his convictions for counts I and V were also obtained in violation of the *corpus delicti* rule because J.M.'s testimony "failed to corroborate any of the specific facts of" defendant's own statements to the police. Alternatively, defendant argues the many inconsistencies in J.M.'s statements rendered the allegations against him "so incredible that no rational trier of fact could have found [his] guilt to be established beyond a reasonable doubt."

¶ 49 When faced with a challenge to the sufficiency of the evidence, "a reviewing court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis and internal quotation marks omitted.) *People v. Harris*, 2018 IL 121932, ¶ 26, 120 N.E.3d 900. "A conviction will not be reversed on appeal for insufficient evidence unless the evidence is so improbable or unsatisfactory that a reasonable doubt remains as to the defendant's guilt." *Id.*

¶ 50 As set forth above, the *corpus delicti* of an offense, *i.e.*, the commission of a crime, "cannot be proven by a defendant's admission, confession, or out-of-court statement alone." *Lara*, 2012 IL 112370, ¶ 17. Rather, "[w]hen a defendant's confession is part of the *corpus delicti* proof, the State must also provide independent corroborating evidence." *Id.* "[C]orroboration is sufficient to satisfy the *corpus delicti* rule if the evidence, or reasonable inferences based on it, tends to support the commission of a crime that is at least closely related to the charged offense." *Id.* ¶ 45.

"Under our system of criminal justice, the trier of fact alone is entrusted with the duties of examining the evidence and subsequently determining whether the State has met its burden of proving the elements of the charged offense beyond a reasonable doubt. Once the case is in the hands of the fact finder, its role is to evaluate the credibility of the witnesses, weigh the conflicting evidence, draw reasonable inferences, resolve evidentiary conflicts to determine the facts, and, finally, to apply the law as instructed to arrive at a verdict. [Citations.] Inherent in those responsibilities is the need to consider a variety of evidence, some conflicting or unclear, addressing the *corpus delicti*, the identity of the offender, or both.

The primary purpose of the *corpus delicti* rule is to ensure the confession is not rendered unreliable due to either improper coercion of the defendant or the presence of some psychological factor. [Citations.] Unless a confession cannot be sufficiently corroborated to fulfill this purpose, it remains one stick in the evidentiary bundle the trier of fact may use in deciding whether the State has met its burden of proving beyond a reasonable doubt that the defendant committed the charged offenses." *Id.* ¶¶ 46-47.

¶ 51 Here, the State charged defendant in count I with predatory criminal sexual assault of a child, alleging "defendant placed his penis in the anus of J.M." See 720 ILCS 5/11-1.40(a)(1) (West 2016) ("A person commits predatory criminal sexual assault of a child if that person is 17 years of age or older, and commits an act of contact, however slight, between the sex organ or anus of one person and the part of the body of another for the purpose of sexual gratification or arousal of the victim or the accused, or an act of sexual penetration, and *** the victim is under 13 years of age ***."). In count V, the State charged him with aggravated criminal sexual abuse, alleging he "transmitted or transferred his semen" onto J.M.'s buttocks. See *id.* § 11-1.60(c)(1)(i) ("A person commits aggravated criminal sexual abuse if *** that person is 17 years of age or over and *** commits an act of sexual conduct with a victim who is under 13 years of age ***."); see also *id.* § 11-0.1 (" 'Sexual conduct' means *** any transfer or transmission of semen by the accused upon any part of the clothed or unclothed body of the victim ***.").

¶ 52 At defendant's bench trial, J.M. testified to the precise acts alleged in counts I and V. Specifically, he described instances when defendant's penis made contact with, and penetrated, his anus, as well as having to wipe defendant's semen off of his buttocks. The evidence showed he described the same acts during his initial CAC interview. Thus, the State's evidence as to counts I and V did not consist solely of defendant's recorded statements to the police. That there were inconsistencies in J.M.'s own statements and variances between J.M.'s version of events and defendant's version were simply matters for the trial court to resolve as the trier of fact in determining whether the alleged crimes were committed. However, under the circumstances presented, the inconsistencies and variances do not establish a *corpus delicti* rule violation.

¶ 53 Further, we find the evidence was not "so improbable or unsatisfactory that a reasonable doubt remains as to *** defendant's guilt." *Harris*, 2018 IL 121932, ¶ 26. As stated, both J.M.'s trial testimony and his statements during the initial CAC interview described the specific acts alleged. Although his statements contained inconsistencies, those inconsistencies were acknowledged by the trial court, and they accounted for the not guilty verdicts for three of the charged offenses. Ultimately, the court's comments reflect that it found J.M.'s testimony credible, particularly where corroborated by defendant's admissions to the police.

¶ 54    In his statements to the police, defendant acknowledged having sexual fantasies about young children (albeit only female children) and engaging in sexual acts with and in the presence of J.M. He admitted masturbating and ejaculating in J.M.'s presence and specifically acknowledged an occasion when his penis came into contact with J.M.'s anus. The trial court found defendant's statements to the police were reliable and not coerced, and we find no error in that determination. Defendant was interviewed by Matthews on two occasions. The tone of both interviews was conversational, and as noted by the court, there were several instances when Matthews attempted to leave the interview room but remained because defendant kept talking. We find defendant's admissions supported J.M.'s statements regarding the specific sexual acts alleged in counts I and V. Accordingly, the evidence presented was sufficient to sustain his convictions for both offenses.

¶ 55                            C. Count VII—Child Pornography

¶ 56    Finally, as stated, defendant argues his child pornography conviction should be reversed because it is based on his possession of material that cannot constitutionally be deemed child pornography. Defendant admits to creating and possessing "collages" that combined, in a sexually explicit manner, images of actual children cut from parenting magazines with images of adult male genitalia that he cut from adult magazines. However, he argues that because his "collages" were not "a record of an actual sex act performed by a child" and no children were harmed by their creation, they do not constitute child pornography and characterizing them as such would violate the first amendment. Defendant maintains that any construction of the Illinois child pornography statute that "could criminalize collages made from lawful images" would render the statute unconstitutional and, thus, the statute should not be interpreted in that manner. We disagree.

¶ 57    In *New York v. Ferber*, 458 U.S. 747, 763 (1982), "[t]he United States Supreme Court recognized child pornography as a category of material outside the protection of the First Amendment." (Internal quotation marks omitted.) *People v. Lamborn*, 185 Ill. 2d 585, 588, 708 N.E.2d 350, 353 (1999). "The reason underlying [*Ferber*'s] holding is that the crime of child pornography is an offense against the child and causes harm 'to the physiological, emotional, and mental health' of the child." *Id.* (quoting *Ferber*, 458 U.S. at 758). Under *Ferber*, a state may prohibit the dissemination of material depicting children "engaged in sexual conduct, regardless of whether the depiction is legally 'obscene.' " *Id.* at 589 (citing *Ferber*, 458 U.S. at 756). Supreme Court authority further provides that states may constitutionally proscribe the possession and viewing of child pornography. *Osborne v. Ohio*, 495 U.S. 103, 111 (1990).

¶ 58    "The purpose of [Illinois's] child pornography statute is to prevent the sexual abuse and exploitation of children." *People v. Hollins*, 2012 IL 112754, ¶ 18, 971 N.E.2d 504. In this case, the State originally charged defendant with child pornography, a Class X felony, under section 11-20.1(a)(1)(ii) of the Criminal Code of 2012 (Code) (720 ILCS 5/11-20.1(a)(1)(ii) (West 2016)). That section provides as follows:
        "A person commits child pornography who:
                (1) films, videotapes, photographs, or otherwise depicts or portrays by means of any similar visual medium or reproduction or depicts by computer any child whom he or she knows or reasonably should know to be under the age of 18 *** where such child *** is:

- 12 -

\*\*\*

(ii) actually or by simulation engaged in any act of sexual penetration or sexual conduct involving the sex organs of the child \*\*\* and the mouth, anus, or sex organs of another person or animal; or which involves the mouth, anus or sex organs of the child \*\*\* and the sex organs of another person or animal[.]" *Id.*

Ultimately, the trial court *sua sponte* found defendant guilty of the lesser included offense of possessing child pornography, a Class 3 felony offense, under section 11-20.1(a)(6) of the Code (*id.* § 11-20.1(a)(6)). That section provides as follows:

"A person commits child pornography who:

\* \* \*

(6) with knowledge of the nature or content thereof, possesses any film, videotape, photograph or other similar visual reproduction or depiction by computer of any child \*\*\* whom the person knows or reasonably should know to be under the age of 18 \*\*\*, engaged in any activity described in subparagraphs (i) through (vii) of paragraph (1) of this subsection[.]" *Id.*

See also *id.* § 11-20.1(c) ("If the violation does not involve a film, videotape, or other moving depiction, a violation of paragraph (6) of subsection (a) is a Class 3 felony \*\*\*.").

¶ 59    At issue is whether defendant's "collages" in this case constitute child pornography under section 11-20.1 of the Code. Statutory interpretation presents a question of law that we review *de novo*. See *Lamborn*, 185 Ill. 2d at 590. "In construing a statute, a court is to ascertain and give effect to the legislature's intent in its enactment." *People v. Geever*, 122 Ill. 2d 313, 324, 522 N.E.2d 1200, 1205 (1988). "The most reliable indicator of legislative intent is the language of the statute, given its plain and ordinary meaning." *People v. Clark*, 2019 IL 122891, ¶ 20, 135 N.E.3d 21. Also, "[i]t will be presumed that the legislature acted in light of the provisions of the Constitution and did not propose to act inconsistently with its protections." *Geever*, 122 Ill. 2d at 324. "Accordingly, a court must construe a statute as not offending the Constitution, provided that the construction is a reasonable one." *Id.*

¶ 60    To support his contention that his "collages" may not constitutionally be deemed child pornography because "they were not the products of child abuse," defendant primarily relies on the United States Supreme Court's decision in *Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002). In that case, the Court considered the constitutionality of portions of the federal Child Pornography Prevention Act of 1996 (CPPA) (18 U.S.C. § 2251 *et seq.* (2012)), which extended "the federal prohibition against child pornography to sexually explicit images that appear to depict minors but were produced without using any real children." *Ashcroft*, 535 U.S. at 239-41. It found those provisions, which included a ban on virtual pornography produced without the use of actual children, infringed upon first amendment rights. *Id.* at 256. In setting forth its decision, the Court determined that the challenged portions of the CPPA impermissibly prohibited "speech that records no crime and creates no victims by its production" and stated that "[v]irtual child pornography is not 'intrinsically related' to the sexual abuse of children." *Id.* at 250.

¶ 61    Significantly, however, the Supreme Court also noted that a separate portion of the CPPA, which "prohibit[ed] a more common and lower tech means of creating virtual images, known

- 13 -

as computer morphing," had not been challenged and was not addressed by its decision. *Id.* at 242. It described the "morphing" of images as follows:

> "Rather than creating original images, pornographers can alter *innocent pictures of real children* so that the children appear to be engaged in sexual activity. Although morphed images may fall within the definition of virtual child pornography, they implicate the interests of real children and are in that sense closer to the images in *Ferber*[, 458 U.S. 747]." (Emphasis added.) *Id.*

Notably, the Court described *Ferber* as involving "images made using actual minors." *Id.* at 241.

¶ 62    Following *Ashcroft*, our supreme court found a portion of the Illinois child pornography statute also violated first amendment protections because, like the federal CPPA, it included a ban on virtual child pornography rather than pornography made with identifiable children. *People v. Alexander*, 204 Ill. 2d 472, 482-83, 791 N.E.2d 506, 513 (2003). The court struck the offending portion, finding it severable from the remainder of the statute. *Id.* at 484. It held that the statute's remaining provisions, which prohibited "making and possessing sexually explicit computer depictions of any *actual* child under 18 years of age" were constitutional. (Emphasis added.) *Id.* at 486. The court further stated as follows:

> "*Ashcroft* addressed only the question of whether a criminal prohibition of virtual child pornography—child pornography produced without using actual children—violated the first amendment. It did not invalidate all child pornography laws. We need not revisit the issue of whether criminalizing child pornography of actual, not virtual, children violates the first amendment. That issue was answered conclusively and convincingly in *Ferber*, and the Illinois child pornography statute comports with that case." *Id.* at 487.

¶ 63    Here, although defendant seeks to apply *Ashcroft* to his particular circumstances, he does not deny that the "collages" he created involved "real" children rather than entirely virtual images. Thus, they are more similar to the "morphed" images described but not addressed by *Ashcroft* and which the Supreme Court contemplated involved a category of speech similar to *Ferber* and outside of first amendment protections. Accordingly, we find *Ashcroft* does not support defendant's position on appeal.

¶ 64    Additionally, we disagree with the proposition underlying defendant's argument in this case that the alteration of otherwise "innocent" or "legitimate" images of an actual minor into one that is sexually explicit results in no harm to the minor because it does not record the minor actually engaging in any sexual activity. In *United States v. Hotaling*, 599 F. Supp. 2d 306, 308 (N.D.N.Y. 2008), the defendant altered nonpornographic images of actual, identifiable children using a computer software program and combined them with pornographic images he obtained on the Internet. Specifically, he placed the heads of minor females "over the heads of unidentified nude or partially nude females in various sex acts and/or lascivious poses." *Id.* at 307. After being indicted for possessing child pornography based on his possession of the altered images, the defendant argued it was unconstitutional to criminalize the "mere possession of 'morphed' images, that is, images which have been altered to appear to depict identifiable minors engaged in sexually explicit conduct." *Id.* at 311. He maintained "that no actual child engaged in the conduct or activities depicted in the altered images and they were produced 'without exploiting minors.' " *Id.*

¶ 65    The district court ultimately denied the defendant's request to dismiss his indictment. *Id.* at 322. It held "that the creation and possession of pornographic images of living, breathing and identifiable children via computer morphing is not 'protected expressive activity' under the Constitution" and such images implicated the interests of real children. *Id.* at 321 (quoting *United States v. Williams*, 553 U.S. 285, 297 (2008)). The court also "strongly disagree[d]" with the defendant's contention "that no demonstrable harm[ ] [citation] results to a child whose face, but not his or her naked body, is depicted in a pornographic image." (Internal quotation marks omitted.) *Id.* at 318. The court's analysis reflects a finding that harm to a minor comes from the creation of a lasting record of the minor " 'seemingly,' " though not actually, engaged in sexually explicit activity. *Id.* at 319 (quoting *United States v. Bach*, 400 F.3d 622, 632 (8th Cir. 2005) (stating that although a minor was not involved in the production of a pornographic image, "a lasting record" had been created of "an identifiable minor child, seemingly engaged in sexually explicit activity," which "victimized" the minor every time the picture was displayed)); see also *United States v. Mecham*, 950 F.3d 257, 267 (5th Cir. 2020) (noting child pornography "decisions have consistently cited the interest in preventing reputational and emotional harm to children as a justification for the categorical exclusion of child pornography from the First Amendment" and finding courts have also "recognized that morphed child pornography raises this threat to a child's psychological well-being").

¶ 66    Further, although the defendant's "collages" in the instant case are more rudimentary than the "morphing" that can be done through the use of computers, they, nevertheless, involve the alteration of "innocent pictures of real children so that the children appear to be engaged in sexual activity." *Ashcroft*, 535 U.S. at 242. We see no basis for finding defendant's "collages" do not pose the same type of reputational or emotional harm as more technologically sophisticated "morphed" images. See *Hotaling*, 599 F. Supp. 2d at 320 (favorably citing an unreported district court decision that "rejected the defendant's arguments that his photo 'collages' made by juxtaposing adult nude bodies with cut-outs of children's faces taken from children's catalogs were protected by the First Amendment").

¶ 67    Here, the materials defendant possessed indisputably involved images of real, identifiable children that were combined with images of penises to depict acts of oral penetration. Such materials fall within the coverage of section 11-20.1 of the Code, and *Ashcroft* does not require a different conclusion.

¶ 68    We note defendant additionally argues that the "collages" he possessed did not constitute "films, videotapes, photographs" or "any similar visual medium or reproduction" as required by section 11-20.1 of the Code. 720 ILCS 5/11-20.1(a)(1) (West 2016). Ultimately, defendant puts forth no real analysis of this claim, and in any event, we disagree.

¶ 69    Section 11-20.1 does not define the term "similar visual medium." However, in plain and ordinary terms, items are "similar" if they "hav[e] characteristics in common" or are "alike in substance or essentials." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/similar (last visited Aug. 16, 2021) [https://perma.cc/K68P-33RZ]. Further, the word "visual" means "of, relating to, or used in vision"; "attained or maintained by sight"; or "visible." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/visual (last visited Aug. 16, 2021) [https://perma.cc/SV3W-388A]. Finally, "medium" is defined as "a means of effecting or conveying something." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/medium (last visited Aug. 16, 2021) [https://perma.cc/D3BU-6ZSK]. The "collages" at issue here were visible and

conveyed a combination of still images taken from magazines. They are akin to photographs and constitute a "similar visual medium" as set forth in section 11-20.1. Accordingly, we find defendant is not entitled to the reversal of his child pornography conviction as argued on appeal.

## III. CONCLUSION

For the reasons stated, we reverse the defendant's conviction and sentence as to count IV charging him with aggravated criminal sexual abuse based upon J.M.'s hand touching defendant's penis but otherwise affirm the trial court's judgment.

Affirmed in part and reversed in part.