NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 200004-U

NO. 4-20-0004

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 25, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS,<br>    Plaintiff-Appellee,<br>    v.<br>MYRON SIMMONS,<br>    Defendant-Appellant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Appeal from the<br>Circuit Court of<br>McLean County<br>No. 18TR21715<br><br>Honorable<br>Pablo A. Eves,<br>Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Justices Turner and Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The State's evidence was sufficient to support the jury's verdict, finding defendant guilty beyond a reasonable doubt of driving while his license was revoked. The *corpus delicti* of the offense was proven by credible and independently corroborative evidence beyond defendant's admission that he was driving the vehicle.

¶ 2    After a jury trial, defendant Myron Simmons was convicted of driving while his license was revoked. He appeals, claiming the State failed to prove the *corpus delicti* of the offense when, other than his admission, there was no independent corroborative evidence establishing he was in actual physical control of the vehicle. We affirm.

¶ 3                                        I. BACKGROUND

¶ 4    In December 2018, the State charged defendant with one count of driving while his license was revoked (625 ILCS 5/6-303(a) (West 2016)) after an accident involving a school bus

and defendant's vehicle. At the jury trial, the State called two witnesses: bus driver Nancy Scott and police officer Brice Stanfield.

¶ 5        Scott testified that, on December 5, 2018, at approximately 7 a.m., she was driving a school bus with two students and a monitor on board when she was rear-ended at a railroad crossing. Scott said defendant "came out of the driver's side of the car" and approached the bus. She did not see anyone else in the car or anyone run from the scene. Upon impact, she telephoned dispatch to advise of the accident. Within 15 seconds of impact, she said she was in the back of the bus checking on the students when she saw defendant get out of the driver's side of the vehicle.

¶ 6        On cross-examination, Scott testified it looked as if the vehicle had tried to swerve to the right, as the passenger-side door of the vehicle was up against the back of the bus. Scott said she did not see the vehicle before impact and did not actually see defendant driving the vehicle.

¶ 7        Stanfield testified he was dispatched to the accident scene. When he arrived, Stanfield saw defendant in the driver's seat. Upon inquiry, defendant told Stanfield he did not have a valid driver's license. The following exchange occurred:

"Q. Thank you. Now, when you spoke to the defendant, who did he say was driving?

A. Initially, he said—he referred to someone else being in the vehicle. And I asked where that person was. And he said he had left and gone to work. And I said what was his name. And he said James. And I said what's James' last name. And he said Smith. And I said, well, we need James Smith to be here for this accident to report, you know, so I could take the accident record. And I asked him to make a phone call.

Q. Thank you, Officer. Did you ever see the defendant make that phone call?

A. I did not, but I did go straight up to the bus driver and check on the bus.

Q. Did James Smith ever show up at the scene of the crash?

A. No.

Q. Didn't the defendant later admit to you that there was no James Smith?

A. Yes.

Q. He admitted to you that he was the driver of that vehicle; is that correct?"

¶ 8 On cross-examination, defense counsel asked Stanfield if he had "just threatened to arrest [defendant] for obstruction of justice." The following exchange occurred:

"A. I had.

Q. So that is when he went with what you were saying that he had been the only one there.

A. I wouldn't say I had threatened him with it. I had learned from witnesses—

Q. Well, I am going to stop you there. I am going to object to any hearsay there. So you told him after discussing—sorry—you discussed James for a little bit; is that right?

A. That is correct.

Q. And then you told [defendant], ['A]re you lying to me[?] If you do not tell me you were driving, I will charge you with obstruction of justice.[']

"A. I did not say he was lying to me. I explained to him that if I determined that he was lying to me, that that would be an additional charge for obstructing justice.

Q. But you actually told him that you were going to arrest him if he did not stop saying that James Smith was driving; didn't you?

A. I told him that I would—if I had to—if I had to go and investigate this further and determine that he was—there was no James Smith, that I would charge—that that would be an additional charge for obstructing justice."

¶ 9    Defendant's counsel played a portion of the video recording from the officer's body camera and Stanfield confirmed the contents. The following exchange occurred:

"Q. And you told [defendant], ['Y]ou are the driver.['] Is that right?

A. I did.

Q. And then you said, ['S]o don't be lying, or I will arrest you for obstruction of justice as well[.'] Is that right?

A. That is correct.

Q. So you did not tell [defendant] that if you found out later that he had been lying to you, he could be arrested?

A. Yes. I had not reviewed my body cam prior to this, but I remember telling him that, you know, if he would lie about who he was or who was the driver, I would arrest him for obstructing.

Q. But as we have just seen, what you said to him was, ['Y]ou are the driver, so stop lying to me or I will arrest you for obstruction of justice.['] Is that right?

A. Through my investigation of the crash, I determined—

Q. No. I am sorry, a yes or no, please, sir.

A. That is what I said to him.

Q. Thank you. Now, after you had that conversation with [defendant], he stopped talking about James Smith; didn't he?

A. Yes."

¶ 10   Stanfield described his encounter with defendant as "fairly upbeat" and "mostly smiling." He said he did not look for a James Smith or try to find defendant's nephew.

¶ 11   On redirect examination, Stanfield explained he interviewed Scott, defendant, and the students on the bus at the scene. He said he concluded defendant "was the only person seen in the vehicle and seen getting out of the vehicle." Stanfield testified: "Based on what I learned from my investigation, in speaking with the witnesses on the bus, I determined [defendant] was the driver. And that is when I reinitiated contact with [defendant]" and had the conversation about an obstruction-of-justice charge depicted on the video and played for the jury.

¶ 12   This court reviewed the body camera video which depicted the officer approach defendant after speaking with the witnesses on the bus. Stanfield said to defendant, "You're the driver. Ok?" Defendant said "Ok. Ok." Stanfield said, "So don't be lying or I'll arrest you for obstruction of justice as well." Defendant interrupted Stanfield, saying, "Ok. Ok, sir." Stanfield said, "The kids all said you were driving," while defendant repeated, "Ok. Ok, sir." Stanfield said, "Ok. So let's be honest about it." Defendant shrugged his shoulders and said, "Ok. Ok." Stanfield said, "There's no James Smith, right?" Defendant said, "Ok. Right. No James Smith." Defendant's tone and expressions can be described by this court as conciliatory, not fearful.

¶ 13   The State presented as an exhibit defendant's certified driving record showing defendant's driver's license was revoked on the day of the accident.

- 5 -

¶ 14 Defendant testified his nephew was driving him in defendant's vehicle. They were on their way "to work." He said he was in the front passenger seat "dozing off because rough night the night before. And next thing [he] know[s] it was a big bump." He did not see the collision. Defendant testified, immediately after impact, "that is when he [(James)] got out of the car." Defendant said James told him he had to "get to work because this was his last—he couldn't get one more point on him and he would be fired." Defendant said he then climbed over the passenger seat and got out of the driver's side to approach the bus driver to inquire whether anyone was hurt. He said he tried to open the passenger-side door but that did not work because the "bus was right here." Defendant said he told Stanfield the truth: his nephew was driving.

¶ 15 Defendant's counsel referred to the conversation the jury had watched on the video. Defendant testified he "changed his story" because Stanfield "threatened" him. He said Stanfield "told [him] he would take [him] to jail." The following exchange occurred:

"Q. So when you told the officer that James wasn't driving or that there was no James there, why did you say that?

A. Because he, one, he threatened me to take me to jail. Two, it was the fact of I didn't know what was on his mind at that point because if you threatened to take me to jail for telling you the truth, what would you do to me anyway.

Q. Okay. When you were speaking with the officer, did you feel calm and safe?

A. Well, me, I wouldn't say actually calm. I would say calm, but not actually safe. Because of his—the way he came and told me that if I did tell him that I was driving, he was going to arrest me, you know.

Q. Now, your impression of the officer, did he seem calm?

- 6 -

A. Not really calm. He seemed agitated."

¶ 16        On cross-examination, defendant said James was about 27 years old. He did not know where James worked even though that was where they were heading that morning. He did not think James went to college or graduated from high school. He said he did not know when he was asked "Now, where's James today?" Defendant said he called James from the accident scene when Stanfield asked him to do so but James did not come back and "[t]hat is why the officer arrested [him]." Defendant admitted he told Stanfield his house key was in the driver's-side door.

¶ 17        On redirect examination, defendant said he knew the general vicinity of where James worked. On recross-examination, when asked what defendant was going to do while James was working, defendant said they were going to pick up "Mr. Stoval," who "stays right around there where [James] works at."

¶ 18        On this evidence, the jury found defendant guilty of driving while license revoked. After denying defendant's motion for new trial, the trial court sentenced defendant to 24 months' conditional discharge and 180 days in jail, which was stayed pending completion of 300 hours' community service.

¶ 19        This appeal followed.

¶ 20                                II. ANALYSIS

¶ 21        On appeal, defendant argues the State failed to prove the *corpus delicti* of the offense of driving while license revoked when there was no independent corroborating evidence sufficient to prove beyond a reasonable doubt that defendant was in actual physical control of the vehicle. Defendant claims the only evidence he was driving the vehicle came from his own admission, which he made only after he was "threatened" with further charges. Thus, he claims his conviction must be reversed under the *corpus delicti* rule. We disagree and affirm.

¶ 22        In *People v. Sargent*, 239 Ill. 2d 166, 183 (2010), our supreme court stated:

> "Under the law of Illinois, proof of an offense requires proof of two distinct propositions or facts beyond a reasonable doubt: (1) that a crime occurred, *i.e.*, the *corpus delicti*; and (2) that the crime was committed by the person charged. [Citations.] In many cases *** a defendant's confession may be integral to proving the *corpus delicti*. It is well established, however, that proof of the *corpus delicti* may not rest exclusively on a defendant's extrajudicial confession, admission, or other statement. [Citation.] Where a defendant's confession is part of the proof of the *corpus delicti*, the prosecution must also adduce corroborating evidence independent of the defendant's own statement. [Citation.] If a confession is not corroborated in this way, a conviction based on the confession cannot be sustained."

¶ 23        This corroboration requirement stems from the mistrust of confessions. *People v. Furby*, 138 Ill. 2d 434, 447 (1990). "To avoid running afoul of the *corpus delicti* rule, the independent evidence need only *tend to show* the commission of a crime. It need not be so strong that it alone proves the commission of the charged offense beyond a reasonable doubt." (Emphasis in original.) *People v. Lara*, 2012 IL 112370, ¶ 18. The independent evidence must do more than merely suggest an offense occurred. *People v. Lambert*, 104 Ill. 2d 375, 380-81 (1984). "Due to the fact-intensive nature of the inquiry, *** the question of whether certain independent evidence is sufficient to establish specific charged offenses must be decided on a case-by-case basis." *Lara*, 2012 IL 112370, ¶ 26.

¶ 24        To convict defendant, the State was required to prove: (1) defendant was in actual physical control of a motor vehicle on any highway (2) at a time when his driver's license was

suspended or revoked. 625 ILCS 5/6-303(a) (West 2016). Thus, the *corpus delicti* in this case is that defendant drove a car on a highway while his license was either suspended or revoked.

¶ 25    "Although the observation of the defendant in the act of driving is not an indispensable prerequisite for a conviction, the act must be established by other credible and substantial evidence, either direct or circumstantial." *People v. Foster*, 138 Ill. App. 3d 44, 46 (1985). If this element is not proven beyond a reasonable doubt, the convictions must be reversed. *People v. Burkholder*, 47 Ill. App. 3d 334, 335 (1977). The defendants in *Foster* and *Burkholder* were both convicted of driving while intoxicated (DUI); however, the State in those cases was also required to prove the element of being "in actual physical control" of a vehicle. See 625 ILCS 5/11-501 (West 2016).

¶ 26    In *Foster*, a police officer was called to a one-vehicle accident. *Foster*, 138 Ill. App. 3d at 45. When he arrived, the defendant was sitting in the passenger seat, and another man was in the driver's seat. *Id.* The defendant told the officer twice that he had been the one driving the vehicle, though he later told the officer he was not the driver. *Id.* at 45-46. The defendant was convicted but appealed, arguing there was no evidence, besides his admission, that he was the driver of the vehicle. *Id.* at 46. On appeal, the court found there was no independent evidence to establish the defendant was the driver. *Id.* In doing so, the court noted the defendant was in the passenger side of the vehicle and no evidence was presented regarding the ownership of the vehicle. *Id.* at 46-47.

¶ 27    In contrast to *Foster*, there are a series of cases in which the appellate court found there was sufficient independent evidence, other than the admission, to establish the defendant was the driver in these DUI cases. In *People v. Lurz*, 379 Ill. App. 3d 958, 972 (2008), the defendant was found one-half mile from where his truck ran out of gas, but he was in possession of the keys

to the truck when he was found. The defendant in *People v. Call*, 176 Ill. App. 3d 571, 577 (1988), was the owner of the vehicle that had been driven into the ditch. Though no one was found near the vehicle and the defendant was found two miles from where the vehicle was, a witness saw someone matching the defendant's description speed past him in the vehicle moments before it went into the ditch. *Id.* The court in *People v. Rhoden*, 253 Ill. App. 3d 805, 812 (1993), noted the defendant was the owner of the vehicle, was standing next to the vehicle after the accident, another man was pinned under the passenger side of the vehicle, and the defendant "took pains to keep the car in good condition, making it unlikely for him to have entrusted the car to" his intoxicated passenger.

¶ 28      We find this case more akin factually to *Lurz*, *Call*, and *Rhoden* than *Foster*. That is, we find there was sufficient evidence, albeit circumstantial, to corroborate defendant's admission. For example, when Stanfield arrived at the scene, he found defendant in the driver's seat. After defendant initially denied being the driver, Stanfield boarded the school bus to speak with witnesses. Stanfield testified, after speaking with witnesses, he concluded defendant was indeed the driver and the only individual in the vehicle at the time of the accident. He testified he confronted defendant with his findings and defendant admitted "there's no James Smith"; he was the driver.

¶ 29      " '[C]orroboration is sufficient to satisfy the *corpus delicti* rule if the evidence, or reasonable inferences based on it, tends to support the commission of a crime that is at least closely related to the charged offense.' " *People v. McKown*, 2021 IL App (4th) 190660, ¶ 50 (quoting *Lara*, 2012 IL 112370, ¶ 45).

> "Under our system of criminal justice, the trier of fact alone is entrusted
> with the duties of examining the evidence and subsequently determining whether

the State has met its burden of proving the elements of the charged offense beyond a reasonable doubt. Once the case is in the hands of the fact finder, its role is to evaluate the credibility of the witnesses, weigh the conflicting evidence, draw reasonable inferences, resolve evidentiary conflicts to determine the facts, and, finally, to apply the law as instructed to arrive at a verdict. [Citations.] Inherent in those responsibilities is the need to consider a variety of evidence, some conflicting or unclear, addressing the *corpus delicti*, the identity of the offender, or both.

The primary purpose of the *corpus delicti* rule is to ensure the confession is not rendered unreliable due to either improper coercion of the defendant or the presence of some psychological factor. [Citations.] Unless a confession cannot be sufficiently corroborated to fulfill this purpose, it remains one stick in the evidentiary bundle the trier of fact may use in deciding whether the State has met its burden of proving beyond a reasonable doubt that the defendant committed the charged offenses." *Lara*, 2012 IL 112370, ¶¶ 46-47.

¶ 30 Reasonable inferences could certainly be made here. After viewing the evidence in a light most favorable to the prosecution, as we are required to do when faced with a challenge to the sufficiency of the evidence (see *People v. Harris*, 2018 IL 121932, ¶ 26), we find (1) Stanfield's testimony about his investigation at the scene, (2) Scott's testimony that she saw defendant exit the vehicle from the driver's side and saw no one else in or around the vehicle, and (3) the contents of the video recording constituted sufficiently corroborating evidence that defendant was the driver. This evidence was supported by the following facts from which reasonable inferences could be drawn: (1) defendant's house keys were found in the driver-side

door compartment, (2) James Smith was not at the scene, and (3) defendant did not call Smith to return to the scene as Stanfield requested.

¶ 31 Simply put, the State produced sufficient evidence for the jury to have determined defendant drove the vehicle while his license was revoked. Defendant admitted to Stanfield he had no valid driver's license and that he drove the vehicle. The independent evidence, or reasonable inferences drawn therefrom, showed (1) defendant was the only person in the vehicle, (2) James Smith did not exist, and (3) Stanfield did not "threaten" or coerce defendant into his confession. Accordingly, we find that the State's independent evidence sufficiently corroborated the circumstances of defendant's confession, which tended to show the commission of an offense and connected him to it. Thus, we find no violation of the *corpus delicti* rule and affirm defendant's conviction for driving while license revoked.

¶ 32                                    III. CONCLUSION

¶ 33 For the foregoing reasons, we affirm the trial court's judgment.

¶ 34 Affirmed.