2026 IL App (2d) 250117
No. 2-25-0117
Opinion filed March 26, 2026

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee,

v.

RONALD LYE, Defendant-Appellant.

Appeal from the Circuit Court of Kane County.
Honorable David P. Kliment, Judge, Presiding.
No. 20-CF-847

JUSTICE HUTCHINSON delivered the judgment of the court, with opinion.
Presiding Justice Kennedy and Justice Jorgensen concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a bench trial, defendant Ronald Lye was found guilty of 12 counts of aggravated criminal sexual abuse of a minor (720 ILCS 5/11-1.60(d) (West 2020)), 14 counts of producing child pornography (*id.* § 11-20.1(a)(1)(i)-(ii), (iv), (c)), and 18 counts of possession of child pornography (*id.* § 11-20.1(a)(6)). (Presently, all offenses of "child pornography" are now referred to as "child sexual abuse material." Pub. Act 104-245, § 50 (eff. Jan. 1, 2026) (amending 720 ILCS 5/11-20.1(a)).) Defendant was sentenced *in absentia* to an aggregate 109-year term. He raises several contentions in this appeal, including the suggestion that most of the production counts should be merged into a single offense because he "plac[ed] a security camera to capture video" and therefore many of the recordings were based on automation. We ultimately reject most of defendant's contentions.

¶ 2    In April 2020, defendant contacted the minor, M.M., through the dating app Grindr. Defendant, who was 49 at the time, worked as a handyman and as a security guard. Defendant and M.M. also communicated through other platforms, such as Snapchat and Instagram. In their direct messages, M.M. told defendant he was 15, and the two discovered that they lived only a few blocks from each other in Aurora. Defendant acknowledged that M.M. was "underage" but quickly overcame his fears—that he was "gona be on: to catch a Predator" or that "the swat team" would "bust down [his] door"—because M.M. was "so cute." M.M. went to defendant's home roughly four to six times between April 26, 2020, and May 6, 2020. There, defendant and M.M. engaged in multiple sex acts, which resulted in defendant's 12 convictions for aggravated criminal sexual abuse of a minor. M.M. testified that the first time he went to defendant's home, M.M. told defendant he was 13. He was in seventh grade. Defendant made several comments that he was "definitely going to jail now" and supplied M.M. with alcoholic drinks. Eventually, M.M.'s parents confronted him about his absence, and M.M. told them about the abuse, which they reported to the authorities. On May 7, M.M. submitted to a sexual-assault evaluation. On May 8, defendant sat for a voluntary interview with investigators. Afterward, defendant allowed investigators to collect a cheek swab, evidence from his home, and his cell phone. He was arrested on May 9. Subsequently, samples taken from several areas on M.M.'s body tested positive for defendant's DNA.

¶ 3    The primary issue before us concerns the video recordings found on defendant's phone. At trial, an investigator, Chris Tunney, testified that when defendant led the police through his home, she observed defendant had an Arlo security system and several cameras. In particular, Tunney noticed a camera in defendant's living room. A search warrant to Arlo yielded videos from

defendant's *exterior* cameras, some of which showed M.M. arriving at defendant's home. Critically, Arlo did not have any recordings of M.M. *inside* defendant's home.

¶ 4 The recordings at issue were ultimately located on defendant's phone by Aurora police detective Sergeant Christopher Coronado, a specialist in computer forensics. Coronado extracted the data from defendant's cell phone and located an encrypted data set, which included a password-protected folder entitled "M[&]M" within an app called "Enchanted Cloud Studios." Coronado was able to decrypt the data and view 130 photos and 28 videos. The videos were largely taken from defendant's living-room surveillance camera, which depicted defendant and M.M. engaging in multiple sex acts. In addition, when the app that was used to create the files is unlocked, it takes a picture of the user as a "security feature." Coronado was able to view those user photos and determine that the only person who had accessed the app (other than Coronado) was defendant.

¶ 5 During his testimony, M.M. identified and described what sex acts were occurring in each of the 14 videos when they were published for the court. In closing argument, the State noted that defendant was well aware he had a surveillance camera in his living room. The State asserted that, because the interior surveillance footage was not on the Arlo app on defendant's phone or in Arlo's cloud servers, it was a reasonable inference that defendant moved the videos to the editing app, locked them using a passcode, and deleted the Arlo security footage: all of which showed defendant's awareness of his own guilt. The trial court agreed with the State.

¶ 6 Now before us, defendant asserts that section 11-20.1(a) of the Criminal Code of 2012 (Code) (720 ILCS 5/11-20.1(a) (West 2020)) permits only one child-pornography production conviction "for videotaping by activating a camera to capture a continuous video." Defendant observes that most of the files Coronado recovered "were less than 20 seconds long" while "some even have the same background music and/or same movie playing on the television in the different

segments." According to defendant, section 11-20.1(a) does not permit multiple production convictions "for each snippet of video in the event the [recorded] film is divided into segments in some later act of editing." We disagree.

¶ 7     We note that, contrary to defendant's assertion, it is not altogether clear that the video files found on defendant's phone were the products of any single "continuous recording." Rather, they appear to be clips from several recordings of defendant and the victim engaging in sex acts on several separate occasions. Defendant also claims that the video camera was "mounted on his living room wall," but there does not appear to be a picture or description of the living room camera beyond the fact that one of the investigators had noticed it. The three record citations in defendant's brief following the statement that the camera was "mounted" do not establish that fact either. One citation refers to the whole of the indictment, and the two transcript citations have nothing to do with the indoor camera. We understand defendant's argument. However, while the camera angle in the videos appears to be consistent throughout the clips, it does not necessarily follow that it was only set up once to record one continuous recording or that defendant only set it to record once. But even if we grant defendant's premise that the living-room camera captured these incidents in one long, continuous recording over nearly two weeks, our analysis would not change, as we explain.

¶ 8     Defendant claims that it is unclear what the "unit of prosecution" is for the offense of producing child pornography. We disagree. We review questions of statutory interpretation *de novo*. *People v. Torres*, 2024 IL 129289, ¶ 31. The statute addressing child pornography describes three different types of conduct which can be broadly termed as the production, possession, and dissemination of child pornography. See 720 ILCS 5/11-20.1(a) (West 2020). Here, we are primarily concerned with the first type of conduct: production. The statute states that

a person commits the act of producing child pornography when he or she: "films, videotapes, photographs, or otherwise depicts or portrays by means of any similar visual medium or reproduction or depicts by computer any child whom he or she knows or reasonably should know to be under the age of 18" engaging in a proscribed act, such as sexual penetration, sexual conduct, lewd exhibition, or lewd touching. *Id.* § 11-20.1(a)(1)(i)-(vii). Subsection (f) of the statute defines " '[p]roduce' " as "to direct, promote, advertise, publish, manufacture, issue, present or show." *Id.* § 11-20.1(f)(2). And the statute is not limited solely to personal computers, such as laptops and desktops, as it also incorporates definitions of " '[c]omputer' " and " 'data' " that embrace any programmable electronic device or media format. *Id.* § 11-20.1(f)(6) (citing *id.* § 17-0.5).

¶ 9 While it is perhaps not a model of conciseness, for the present inquiry, section 11-20.1 of the Code is clear. Each of the video files found on defendant's phone was unquestionably produced—or created, or manufactured, or directed, or edited, or issued—by defendant. Part of defendant's argument also strains credulity as he repeatedly describes his conduct exclusively as "videotaping." That is far too cramped a description of his conduct. Here, defendant knowingly made the initial recordings, which he then edited and moved to a password-protected location on his phone. He then likely deleted the original Arlo footage from inside his house, as no other explanation seems compatible with the fact that Arlo only found footage of M.M. from the exterior cameras. In short, the evidence demonstrated that defendant exhibited a far greater degree of control over the production than merely installing the living room camera and simply pushing "record."

¶ 10 Rather than engage with the plain language of the statute, defendant points us in the direction of legislative history. He notes that in *People v. McSwain*, 2012 IL App (4th) 100619, ¶ 64, the court determined the possession section of section 11-20.1(a) was ambiguous, and

because the defendant there simultaneously possessed multiple images of the same minor, sent to him in a single e-mail, he could be sentenced only on one count of child pornography possession. Here, defendant notes that after *McSwain*, the legislature amended section 11-20.1(a) to clarify that "[t]he possession of each individual film, videotape, photograph, or other similar visual reproduction or depiction by computer *** constitutes a single and separate violation." Pub. Act 98-437 (eff. Jan. 1, 2014) (adding 720 ILCS 5/11-20.1(a-5)). Defendant relies on the interpretive canon, *expression unius est exclusion alterius*, which is Latin stating that the enumeration of one thing means the exclusion of anything not mentioned. According to defendant, because the legislature amended section 11-20.1 to more clearly express that it intended to treat each instance of child pornography *possession* separately, but did *not* add that language to the child pornography *production* section, then we should infer that no matter how many clips someone produces from a single video, or how many videos one takes of the sexual abuse of a single child, there can be only one production conviction. We disagree with defendant on this point as well.

¶ 11   Legislative silence regarding the production section of the statute simply is not persuasive. "Not every silence is pregnant" (*State of Illinois, Department of Public Aid v. Schweiker*, 707 F.2d 273, 277 (7th Cir. 1983)), and sometimes a legislature's "silence signifies merely an expectation that nothing more need be said in order to effectuate the relevant legislative objective" (*Burns v. United States*, 501 U.S. 129, 136 (1991)). That appears to us to be the case here, and we have no reason to conclude that the legislature intended to signal anything regarding child pornography production when it explicitly amended the section on child pornography possession to address *McSwain*—a case that dealt exclusively with child pornography possession and never involved the subsection on production. See *McSwain*, 2012 IL App (4th) 100619, ¶ 4.

- 6 -

¶ 12    Now, let us consider what the General Assembly *did* say in the statutory text of the production statute. Recall that under section 11-20.1(a)(1), criminal liability for child pornography production also attaches to knowingly reproducing or copying any media containing child pornography. 720 ILCS 5/11-20.1(a)(1), (f)(3) (West 2020). Along with the definition of "produce," it is clear to us that the unit of prosecution for the production of child pornography is "the product"—*i.e.*, any single, discrete, identifiable media, that did not exist in its present form before a defendant created it. That same understanding can be applied whether the depiction is on film, or a photograph, or a digital image, or a VHS tape, or a digital recording. In this case, for example, where relevant, each count of the State's indictment identified the specific digital file name it used as the basis for each charge and identified the prohibited sex act depicted therein. That was certainly a reasonable approach. See *People v. Covalt*, 2025 IL App (5th) 220346, ¶ 61 (where "each count was premised on a separate filming, photographing, or reproduction"); *cf. People v. Crespo*, 203 Ill. 2d 335, 342 (2001) (noting it is for the State to apportion the defendant's criminal conduct through its charges).

¶ 13    We find *Covalt* persuasive. There, the "defendant repeatedly photographed or filmed the victims within a short period, which created numerous individual [digital] photographs and videos." 2025 IL App (5th) 220346, ¶ 63. As the court noted, " '[f]ilming,' 'photographing,' and 'reproducing' are all methods to violate the statute." *Id.* ¶ 89. The Fifth District found that "[e]ach production is related in that they took place within a similar time frame and depicted the same children, but each production did not arise from the same act." *Id.* ¶ 63. An important caveat, however, is that the court in *Covalt* also determined that "a single filming, photographing, or depicting any number of juveniles by other means can sustain only one conviction" (*id.* ¶ 149), as

the number of victims is not dispositive of the unit of prosecution (*id.* ¶ 148 (citing *People v. Hartfield*, 2022 IL 126729, ¶ 83)).

¶ 14    What *Covalt* determined for child pornography possession, we decide here for child pornography production. We agree with defendant that under a product-based unit of prosecution, when a depiction contains two or more sex acts, or two or more acts that would qualify as violations of section 11.20(a)(i) through (vii), there can be only one conviction. Here, the State charged defendant with, and secured, two production convictions and two possession convictions based on a single sex act in one of the recordings. That is, the State alleged the same act (oral sex) also qualified as lewd touching, making the same recording twice punishable on two different theories. We agree with defendant that these surplus convictions were improper and should not have resulted in multiple sentences. Accordingly, we vacate defendant's sentences for counts 30 and 35 (for producing and possessing child pornography exhibiting lewd touching) but leave undisturbed his convictions for counts 18 and 48 (for producing and possessing child pornography depicting oral sex).

¶ 15    There are some obvious consequences to our interpretation of section 11-20.1(a) in the digital age and in this case, and it is appropriate to state them here. As we have said, a person can violate the child pornography statute by either producing, disseminating, or possessing child pornography. These are three distinct acts, none of which is the lesser-included offense of any other. For example, it is possible to record (or copy) a video or an image without sending it to others and without retaining control over it; it is possible to send a file and then delete it without having produced the original recording; and it is possible to possess a file without sending it to anyone and without having recorded it. See *People v. Reveles-Cordova*, 2020 IL 124797, ¶ 13 (it must be impossible to commit the greater offense without necessarily committing the lesser

offense); *United States v. Gomez-Diaz*, 911 F.3d 931, 934 (8th Cir. 2018) ("Possession of child pornography includes at least one element that production of child pornography does not: possession."). Now, take defendant's situation by way of example. Suppose a defendant comes into possession of minute-long video file, *A*, on his phone, which contains child pornography. Assume he edits *A* into three separate 20-second clips, thereby creating files *B*, *C*, and *D*. Let us further assume that he does not traffic or disseminate this content to anyone else. Under a product approach, the defendant may be charged with three child-pornography production charges for *B*, *C*, and *D*, and four possession charges for *A*, *B*, *C*, and *D* (assuming *A* has not been deleted). If, like here, the defendant did not just find *A*, but either recorded it or copied it from some other medium—*i.e.*, he *produced* it—that is potentially *eight* offenses, each carved from a distinct deliberate physical act, all originating from the product, *A*, even if he is not part of any criminal sex act depicted therein.

¶ 16    Contrary to defendant's suggestion, we believe this result is precisely what the legislature intended—punishment for each knowingly-created "snippet." When a unit of prosecution might be ambiguous, the legislature has found it appropriate to clarify its intent, as it did with child pornography possession and, for example, the Illinois Controlled Substances Act. See Pub. Act 90-593, § 25 (eff. June 19, 1998) (amending 720 ILCS 570/401, 402) (authorizing multiple punishments for simultaneous possession of each type of controlled substance). But the production statute is not ambiguous, and its result is not unduly harsh. It is consistent with the long-held belief that, given the pernicious form of continued abuse that comes with child pornography, "severe criminal penalties" are "the only practical method of law enforcement *** to dry up the market" for its availability. *New York v. Ferber*, 458 U.S. 747, 760 (1982); see *Osborne v. Ohio*, 495 U.S. 103, 110 (1990) ("Given the importance of the State's interest in protecting the victims of child

pornography," the State was justified in "attempting to stamp out this vice at all levels in the distribution chain."); *People v. Geever*, 122 Ill. 2d 313, 326 (1988) ("[i]n prohibiting without restriction possession of child pornography, the legislature has sought to 'dry up' the final *** link in the chain of distribution"); *cf. United States v. Nania*, 724 F.3d 824, 841-42 (7th Cir. 2013) (noting that "an assured life term" is an appropriate "deterrence to criminals who might consider *producing* child pornography" (emphasis added)). Contrary to defendant's suggestion, we do not find the amendment that clarified that multiple sentences may be imposed for child pornography possession expressed any sort of restriction on multiple sentences for its production. See *Burns*, 501 U.S. at 136 ("[a]n inference drawn from [legislative] silence certainly cannot be credited when it is contrary to all other textual and contextual evidence of [its] intent"). We therefore determine that defendant's multiple production sentences were appropriate.

¶ 17    We briefly address defendant's contentions concerning his sentence. As noted, *supra* ¶ 1, defendant was sentenced *in absentia*. He raises several claims surrounding that event, but none are persuasive.

¶ 18    This case was pending in the trial court for nearly five years. During that time, and even throughout the COVID-19 pandemic, defendant was out on bond and never missed a court date. After defendant was found guilty, the trial court continued his bond pending sentencing, and it admonished defendant that he would forfeit his right to be present if he failed to appear for any future hearings. 725 ILCS 5/113-4(e) (West 2020). Here is that exchange:

> "THE COURT: You also understand that if you fail to appear for any future court dates, I will issue a warrant and we'll proceed with sentencing without you.
>
> Do you understand that?
>
> THE DEFENDANT: I understand, Your Honor.

THE COURT: All right. *** I'll continue the matter for hearing, [posttrial] motions, and sentencing if we get that far, February 28[, 2025] at 1:30."

On February 28, however, defendant did not appear. Defendant's retained counsel stated that he received a phone call from defendant's friend that he was taking defendant to a hospital in Naperville with complaints of chest pains, shortness of breath, and suicidal ideations. Counsel stated that he had asked if defendant could appear via Zoom, but the hospital staff stated they would not permit it while defendant was still in "intake." Counsel asked the court to continue the sentencing hearing. The State objected and noted that no evidence had been introduced to indicate defendant's failure to appear was not willful. The trial court found defendant had willfully failed to appear. M.M. and both of his parents read victim-impact statements, and the trial court sentenced defendant to an aggregate 109-year term. After the hearing, defendant's private attorneys sought leave to withdraw and asked the court to appoint the appellate defender; the court granted both requests. The following day, defendant appeared in bond court with the public defender and was informed that his private counsel had been granted leave to withdraw. Defendant said he would contact them, and he was remanded to custody. A few days later, the trial court judge explained what had happened and admonished defendant regarding postsentencing motions and defendant's appeal rights. See Ill. S. Ct. R. 605(a) (eff. Apr. 15, 2024). Defendant indicated he would contact trial counsel. A few weeks later, counsel filed a limited appearance and a notice to appeal.

¶ 19    Defendant now contends that at the sentencing hearing, "counsel provided evidence that [defendant] was in the hospital" and the trial court abused its discretion by sentencing him *in absentia*. We disagree. First, while we, like the trial court, are willing to accept counsel's offer of proof as a fair statement of what *counsel* heard or said, no *evidence* was ever presented to the trial court to substantiate that defendant was in the hospital, let alone that he was there due to an

emergent health condition. Second, defendant concedes that "the State established a *prima facie* case for willful absence" but paradoxically asserts that, because of his sentencing exposure, this was "a situation in which more should have been required of the State." We do not see how. As our supreme court recently stated, a criminal defendant does not just have a right to be present; he "has a duty to be present, and he waives the right *** when he voluntarily absents himself." *People v. Hietschold*, 2025 IL 130716, ¶ 31. Defendant was advised of the sentencing date and the consequences of not appearing. Neither section 113-4(e) nor Rule 605(a) required the trial court to do anything more. See *id.*; *People v. Phillips*, 242 Ill. 2d 189, 194-95 (2011); *People v. Smith*, 188 Ill. 2d 335, 341-42 (1999).

¶ 20   Defendant characterizes his hospitalization as "involuntary," and here, too, we must disagree. This was not a situation where defendant had longstanding health issues of which the trial court judge was aware, was hospitalized for those issues, and nonetheless attempted to appear via Zoom, as in *People v. Ellis*, 2024 IL App (4th) 231540-U, ¶ 59. *Ellis* is clearly distinguishable, as the defendant there had a history of physical and mental issues and still attempted to make a remote appearance, whereas here there is nothing similar in the record. Defendant's claims are also undercut by the fact that he appeared the day after he was sentenced and expressed no health concerns that might hinder him from proceeding or would make his future appearance uncertain.

¶ 21   We also have difficulty accepting defendant's claim that he was "prejudiced" by being sentenced in his absence. Defendant does not identify any information he would have presented to the trial court that had a reasonable probability of resulting in a shorter sentence. At the hearing, counsel claimed defendant had a statement to read, but he had not given it to counsel so his attorney could not read it for him. It would be speculative in the extreme to assume that defendant would have accepted responsibility for the charged offenses and shown remorse; he could just as easily

- 12 -

have continued to blame M.M. for seeming older than he was, as he did in his interview with the police. We cannot say. Regardless, we take the record as it is, and it was not unreasonable for the trial court judge to move forward with sentencing in defendant's absence.

¶ 22    Defendant next contends that private counsel was ineffective for seeking leave to withdraw without "prior notice." Illinois Supreme Court Rule 13(c)(2) (eff. Jan. 1, 2023) provides that "an attorney may not withdraw his or her appearance for a party without leave of court and notice to all parties of record." The notice must state that the defendant must have new counsel file an appearance "within 21 days after entry of the order of withdrawal." *Id.* Here the record indicates that within 24 hours of counsel being granted leave to withdraw, defendant was notified of the same in open court, where he was represented by substitute counsel, the public defender. That was well in advance of the 21 days required by Rule 13. Then, the same private attorney entered a limited scope appearance in the trial court. We do not know if counsel sent defendant a written or electronic notice, but the record shows defendant was made aware that his attorneys had been granted leave to withdraw during his absence. To the extent defendant asserts counsel did not consult with him to set aside the willful-absence finding or a postsentencing motion, we likewise cannot tell one way or the other. Issues concerning counsel's advice are unlikely to be developed in the record on direct appeal, and it is not our province to speculate.

¶ 23    Finally, defendant contends that the trial court improperly relied on factors inherent in the offenses to elevate his sentence. As the State notes, in order to preserve this claim, defendant was required to file a postsentencing motion raising the issue, else it may only be reviewed for plain error. The error can only be plain if indeed there was one. Here, there was not. The four factors defendant identifies—knowledge of the illicit nature of the sex acts, the victim's age, the fact that defendant recorded the acts, and that there was more than one offense—were all discussed by the

sentencing judge but only in the context of describing the case before the court. The court did not identify any of these factors as cause to elevate defendant's sentence for any specific offense. The court's comments were, under the circumstances, quite natural, appropriate, brief, and measured. A trial court has considerable discretion at sentencing, and we determine the court did not abuse it here.

¶ 24    We therefore vacate defendant's convictions for counts 30 and 35. In all other respects, we affirm the judgment of the circuit court of Kane County.

¶ 25    Affirmed in part and vacated in part.

*People v. Lye*, 2026 IL App (2d) 250117

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Kane County, No. 20-CF-847; the Hon. David P. Kliment, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Christopher McCoy, and Amaris Danak, of State Appellate Defender's Office, of Elgin, for appellant. |
| **Attorneys for Appellee:** | Jamie L. Mosser, State's Attorney, of St. Charles (Patrick Delfino, Edward R. Psenicka, and Jenna Seaver, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |